**In re The Matter of C.C.S.**

**Barbara Rash, Appellant,**

v.

**Robin Wilson, Respondent.**

**No. WD 75298.**

Missouri Court of Appeals,
Western District.

Jan. 29, 2013.

Phillip J. McIntosh, Kirksville, MO; Barry V. Cundiff, Kirksville, MO, for appellant.

Lance M. McClamroch, Kirksville, MO, for respondent.

Before Division Two: KAREN KING MITCHELL, Presiding Judge, THOMAS H. NEWTON and LISA WHITE HARDWICK, Judges.

LISA WHITE HARDWICK, Judge.

Barbara Rash appeals the circuit court's judgment appointing Robin Wilson to be guardian of Wilson's minor grandson, C.C.S. Rash contends that, in awarding guardianship to Wilson and denying her request for visitation, the court did not consider C.C.S.'s best interests because it did not discuss or apply the best interest factors enumerated in Section 452.375.2.[1] Rash also asserts that the court gave undue weight to the blood relationship between C.C.S. and Wilson. Additionally, Rash argues that the judgment is against the weight of the evidence and is not supported by substantial evidence. For reasons explained herein, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

C.C.S. was born on September 19, 2008, to Chantelle Watson and Robert Wilson.[2] Chantelle and Robert were not married and were no longer together at the time of C.C.S.'s birth. Chantelle asked her friend, Rash, who had dated Chantelle's father from 1995 through 2005, to text Robert to notify him of C.C.S.'s birth. Robert did not try to visit with C.C.S. at that time because he was "going through some legal issues" and was not prepared to be a parent. Robert's mother, Wilson, wanted to have contact with C.C.S., but she did not seek visitation because she "thought it was something that Robert and Chantelle needed to work out."

---

1. All statutory references are to the Revised Statutes of Missouri 2000, as updated by the Cumulative Supplement 2011.

2. To avoid confusion, we will refer to C.C.S.'s parents by their first names. No disrespect is intended.

When Chantelle and C.C.S. were released from the hospital, Rash drove them to Chantelle's home and stayed with them through the evening. As Rash prepared to leave, Chantelle told her to take C.C.S. with her. Rash took C.C.S. to the home she shared with her boyfriend, James Middleton, and his elderly father.

After C.C.S. went home with Rash, Chantelle would take C.C.S. for only short periods, usually one night or a couple of days, before she would call Rash to come get him. Chantelle then began using drugs and having even less contact with C.C.S.

When C.C.S. was four months old, Rash took him to the doctor for a checkup. The doctor noticed that the child had been born with drugs in his system. Thinking that C.C.S. was in Chantelle's care, the doctor told Rash that she was required to make a hotline call to report her concerns. Rash told the doctor that she feared that C.C.S. would be placed in foster care if a hotline call was made. The doctor agreed to wait to make the hotline call to allow Rash to make arrangements to avoid foster care. Rash and Chantelle spoke to an attorney about Rash's options.

On January 26, 2009, Rash filed a petition for guardianship of C.C.S. Chantelle filed her consent to the guardianship. Rash's petition listed the child's father as "unknown" and did not list any possible fathers. At that time, however, Rash knew that Chantelle and Robert were living together when Chantelle got pregnant, that Chantelle had previously told her that Robert was possibly the father, and that Chantelle had asked her to send Robert a text notifying him of C.C.S.'s birth. Moreover, Rash had Robert's phone number and knew where he lived when she filed the guardianship petition. Nevertheless, Rash did not have Robert served with the petition, and he received no notice of the

proceeding. On February 20, 2009, the Adair County Circuit Court entered a judgment appointing Rash to be C.C.S.'s guardian.

In September 2009, Robert decided that he wanted to meet C.C.S. Unaware that the child was living with Rash and not Chantelle, Robert attempted to contact Chantelle to schedule a visit. When he could not reach Chantelle, Robert called Rash to find out if she had Chantelle's contact information. Rash told Robert that C.C.S. was with her, and they arranged for Robert to visit the child.

Shortly thereafter, Robert and Wilson went to Rash's house to visit C.C.S. Wilson then learned, for the first time, that Chantelle was not C.C.S.'s caretaker and that Rash had been appointed his guardian. Believing that C.C.S. should be raised by his biological family rather than by a non-family member, Wilson hired an attorney for Robert to pursue custody of the child. Robert subsequently filed a motion to terminate the guardianship. Robert also filed an action for determination of paternity and custody in Clark County, which was where he lived.

In the meantime, Robert requested more visits with C.C.S. Rash allowed Robert to have visitation every other weekend at the Rash home. Eventually, those visits progressed into overnight visits at Wilson's home.

Rash discontinued this visitation in March 2010, however, and made a hotline call to Children's Division to report bruises she found on C.C.S.'s buttocks following a visit with Robert. Robert told Rash that the bruises were caused by C.C.S.'s bouncing in his swing or sliding on his bottom down the stairs, but Rash did not believe him. Children's Division investigated and found the abuse allegations unsubstantiated. Children's Division also determined

that the child was at low risk, and no family-centered services case was opened.

Despite these findings, Rash continued to deny the Wilson family any contact with C.C.S. Robert called her on multiple occasions to request visits, but she would not return his calls.

In December 2010, the Clark County Circuit Court entered a judgment declaring Robert to be C.C.S.'s father. Because of the Adair County guardianship case, the court declined to enter a custody order. In July 2011, the Adair County Circuit Court entered a judgment setting aside Rash's guardianship of C.C.S. for lack of jurisdiction on the basis that proper service on Robert was not obtained.

Rash thereafter filed a second petition for guardianship of C.C.S. Wilson was granted leave to intervene and also filed a petition for guardianship in August 2011. At that time, Robert was incarcerated in the Clark County Jail for assault. After Wilson filed her guardianship petition, Rash allowed her to visit C.C.S.

Per Rash's request, the court ordered Children's Division to perform a home study on Wilson's home and on Rash's home. After conducting the studies, Children's Division concluded that Wilson and her live-in boyfriend, Larry Ball, could serve as licensed foster parents for C.C.S., but there were "several concerns" in Rash's and Middleton's home that would prevent them from becoming licensed foster parents.

Trial was held on both guardianship petitions in January 2012. Neither Chantelle nor Robert filed an answer or participated in the trial, but Chantelle filed her consent to Rash's appointment.[3] At the close of the evidence, the guardian ad litem recommended that Wilson be appointed C.C.S.'s guardian. The court subsequently entered its judgment appointing Wilson to be C.C.S.'s guardian. Rash filed a motion for visitation and for rehearing, both of which were denied. Rash appeals.

## STANDARD OF REVIEW

Our review of the circuit court's judgment in proceedings to appoint a guardian is governed by the standards set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *In re Estate of A.T.*, 327 S.W.3d 1, 2 (Mo.App.2010). We must affirm the judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* We view the evidence and any reasonable inferences therefrom in the light most favorable to the court's decision and disregard all contrary evidence and inferences. *Pulley v. Sandgren*, 197 S.W.3d 162, 165 (Mo.App.2006). In doing so, we recognize that the court was free to believe or disbelieve all or any part of the witnesses' testimony. *A.T.*, 327 S.W.3d at 2.

## ANALYSIS

In Point I, Rash contends that, in awarding guardianship of C.C.S. to Wilson and denying Rash's request for visitation, the court did not consider C.C.S.'s best interests because it did not discuss or apply the best interest factors enumerated in Section 452.375.2. Rash argues that "[w]hat standard the judge did apply is not readily apparent" from the judgment, but it was not a best interests of the child standard.

The probate code has three statutes that govern the appointment of a guardian for a

---

3. At the time of trial, Chantelle was in the Adair County Drug Court Program and her other biological children were in alternative care. Robert remained incarcerated for assault.

minor. *A.T.*, 327 S.W.3d at 2. Section 475.025 provides that parents are the natural guardians of a minor child. Section 475.030.4 allows the court to appoint a statutory guardian for the minor child in three instances, including where, as here, the parents are unwilling, unable, or adjudged unfit to assume the duties of guardianship. Where the parents are unwilling, unable, or unfit to assume guardianship, Section 475.045.3 directs the court to appoint as guardian "the most suitable person who is willing to serve and whose appointment serves the best interests of the child to a stable and permanent placement."

In its judgment, the court found that Wilson is the most suitable person who is willing to serve as guardian and whose appointment serves the best interests of C.C.S. to a stable and permanent placement. Rash argues that this finding is insufficient because the court should have explained why placement with Wilson is in C.C.S.'s best interests based upon the factors listed in Section 452.375.2. We disagree.

██ We first note that the court was under no duty to make written findings explaining its decision. Rash could have requested written findings on any controverted fact issues in the case pursuant to Rule 73.01(c). Such a request would have had to have been made on the record *before* the introduction of evidence or at a later time, if the court so allowed. *Id.* Rash did not request findings of fact on any issues before the introduction of evidence or at any time during the trial. Therefore, the court did not err by failing to make findings explaining why Wilson's appointment is in C.C.S.'s best interests.[4]

Furthermore, there is no express or implicit indication in Section 475.045.3 that the legislature intended for the court to apply Section 452.375.2 to determine whether the appointment of a particular guardian "serves the best interests of the child to a stable and permanent placement." Section 452.375 governs custody determinations in dissolution of marriage proceedings and provides eight factors for the court to consider in deciding which custody arrangement would be in the child's best interests. These factors are, in pertinent part:

(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;

(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;

(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

(5) The child's adjustment to the child's home, school, and community;

(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved....;

(7) The intention of either parent to relocate the principal residence of the child; and

---

4.  Moreover, even if Rash had made a request pursuant to Rule 73.01(c) and the court had not made the requested findings, her claim of error would still fail because it was not pre-served in a post-trial motion to amend the judgment. Rule 78.07(c); *Jenkins v. Jenkins*, 368 S.W.3d 363, 369 (Mo.App.2012).

(8) The wishes of a child as to the child's custodian. . . .

§ 452.375.2.

Many of these factors are not applicable to guardianship proceedings. Factors (1), (2), (3), (4), and (7) primarily concern fostering the child's relationship with both parents—a concern that is always relevant in determining the child's best interests in a custody proceeding but may not be relevant in a guardianship action where, as here, both parents are unwilling, unable, or unfit to assume guardianship. Moreover, with regard to factor (8), the wishes of the child as to his custodian, this court has held that "[t]here is no requirement in the [probate] code that the court consider the preference of a child fourteen or under[ ] when appointing a guardian." *In re S.M.*, 938 S.W.2d 910, 923 (Mo.App.1997). In *S.M.*, we explained that Section 475.045.1(2) provides for only minors over the age of fourteen and without a qualified, living parent to nominate a guardian. *Id.* As for the other factors in Section 452.375.2, the child's adjustment to his home, school, and community and the mental and physical health of all individuals involved, including any history of abuse, while they might also be applicable to guardianship proceedings, those factors would be relevant only to the extent they impact the suitability of the potential guardian and the child's best interests to a stable and permanent placement.

Indeed, the language of Section 475.045.3 directs that the stability and permanency of the placement is the focus of a best interest analysis in a guardianship proceeding. The language of Section 452.375.2 does not similarly direct the focus of a best interest analysis in a custody proceeding. This difference between the two statutes, combined with the lack of any reference in the guardianship statutes to Section 452.375.2's factors and the inapplicability of most of those factors to guardianship proceedings, indicates that the legislature did not intend to require the court to apply Section 452.375.2's factors to determine the best interests of the child in a guardianship proceeding.[5]

While the court was not required to apply Section 452.375.2's factors in determining which appointment—Rash's or Wilson's—would serve C.C.S.'s best interests to a stable and permanent placement, the majority of the evidence offered at trial actually did concern two of those factors: the mental and physical health of all individuals involved, including any history of abuse, and C.C.S.'s adjustment to his home, school, and community. When viewed in the light most favorable to the judgment, the evidence on those issues, as they impact the suitability of C.C.S.'s potential guardians and his best interests to a stable and permanent placement, weighs in favor of Wilson's appointment.

With regard to Rash, she has COPD, chronic asthma, and emphysema and is unable to work due to those conditions. She also takes medication for depression. Middleton, with whom she has lived for four years, has been diagnosed as bipolar, obsessive compulsive, and an alcoholic. He is taking medication for all of these conditions and has twice received rehabilitation treatment for his alcoholism. Ac-

5. To support her claim that Section 452.375.2's factors apply to guardianship proceedings, Rash cites *In re Schnieders*, 178 S.W.3d 632, 633–34 (Mo.App.2005). In *Schnieders*, we held that the legislature's 2001 amendment to Section 475.083 required the court to consider whether termination of a guardianship is in the minor's best interest before terminating a guardianship on the basis that the parent is no longer unfit. *Id.* We did not state in *Schnieders* that, when applying the best interest standard, the court is required to consider or discuss Section 452.375.2's factors.

cording to Rash, when Middleton drinks too much, he gets loud and argumentative. She has kicked him out of the house two times due to his drinking.

Rash admitted that, during the time that C.C.S. has been living with them, she and Middleton have gotten into multiple arguments that included screaming and acts of domestic abuse. According to Rash, she is more aggressive than Middleton. During one of their arguments, she broke the glass in the china cabinet. During another argument in January 2011, Middleton, who was drunk at the time, poked her in the chest, pushed her backward, and swung his fist at her. Instead of hitting Rash, he hit the door frame, injuring his hand. When Rash tried to call the police, Middleton grabbed her and knocked the phone out of her hand. Middleton later pled guilty to domestic abuse as a result of that incident and was on probation at the time of trial. Rash and Middleton admitted that the police were called to their house several times from 2009 to 2011 due to either domestic disputes or complaints from neighbors about Middleton's playing music too loudly.

Although C.C.S. was in the home during all of this, Rash testified that C.C.S. was asleep and was never awakened by the screaming arguments, the incidents of domestic abuse, Middleton's loud music, or the police calls to the home. Rash also testified that Middleton had been sober for six months and that, if he drank again, she would kick him out for good. The circuit court was free to disbelieve her testimony, and we defer to its decision to do so. *A.T.*, 327 S.W.3d at 2.

In addition to Middleton's issues, another area of concern was Rash's allowing Wendy Kent, who was a friend of Rash's

daughter, to stay in the home with her infant daughter for a couple of weeks in the fall of 2011. Kent had recently been released from prison, where she was serving time for violating her probation for a drug offense. While Kent and her daughter lived in the Rash home, she was supposed to receive substance abuse treatment but did not do so. She also violated her parole by using alcohol. Rash asked Kent to leave only after C.C.S.'s guardian ad litem performed a home visit, discovered Kent and her daughter were living there, and voiced his concerns to Rash about Kent being around C.C.S.

Based upon its home study, Children's Division found "several concerns" that would prevent Rash and Middleton from being a licensed foster care home for C.C.S. Similarly, when the guardian ad litem made his recommendation, he stated that Middleton's alcohol use, the domestic situations that have arisen because of it, and Rash's allowing Kent in the home, all of which occurred throughout C.C.S.'s placement in the home, did not provide the safest or most secure environment for the child.

Instead, the guardian ad litem recommended that Wilson be appointed C.C.S.'s guardian. Children's Division found nothing in its home study of Wilson and Ball that would prevent them from being a licensed foster care home for C.C.S. They have lived together for six years and do not have any mental or physical health issues.[6] There have been no acts of domestic abuse in their home, and the police have never been dispatched to their home. Although Wilson's three adult children have struggled with substance abuse problems, they are not members of her house-

---

6. Although there was evidence that Ball's driver's license was suspended in 1990 and revoked in 1995 for alcohol-related offenses, there was no evidence that Ball is an alcoholic. Wilson has no substance abuse issues.

hold and visit only for holidays and special occasions. Wilson testified that any contact that C.C.S. might have with her adult children—including C.C.S.'s father, Robert—would be supervised. Again, the court was free to believe Wilson, and we defer to its credibility determination. *Id.*

Rash offered evidence favorable to her appointment, including that C.C.S. was well-adjusted in her home and was doing well in his preschool. She also argued that he is bonded to her because he has lived with her for all three years of his life. The record shows, however, that this was due in large part to Rash's failing to provide notice to Robert before obtaining the first guardianship. Moreover, Wilson testified that C.C.S. is eager and happy to be with her, does not get homesick for Rash, and has no behavior problems while in her care.

Christopher Maglio, a child psychologist who testified on behalf of Wilson, opined that, while transferring C.C.S. from Rash to Wilson might cause the child short-term emotional stress, it would be "very unlikely" to affect him for long and would not cause him any psychological trauma. Maglio testified that the most important consideration for C.C.S., at his age, is that he be in a stable environment. Based upon the home studies, Maglio believed that Wilson's home provided such stability, while Rash's did not. Additionally, Maglio believed that, to aid in the transition process, Rash should not have visits with C.C.S. until after the child is settled in Wilson's home.

This evidence demonstrates that, in appointing Wilson to be C.C.S.'s guardian and denying Rash visitation at this time, the court considered not only who is the most suitable person willing to serve, but also whose appointment serves the child's best interests to a stable and permanent placement. Rash's contention that the court did not consider C.C.S.'s best interests because it did not discuss or apply the factors in Section 452.375.2 is without merit. Point I is denied.

In Point II, Rash contends that the court gave "undue weight" to the biological relationship between Wilson and C.C.S. She argues that, when choosing a minor's guardian, any preference for a relative is a limited one and arises only when all other things are equal, citing *In re D.E.B.*, 244 S.W.3d 766, 768 (Mo.App.2008). Although Rash correctly states the law, the evidence discussed *supra* shows that the competing homes were not equal and, therefore, the court did not even need to consider the biological relationship to award guardianship to Wilson. Point II is denied.

Lastly, in Point III, Rash asserts that the court's judgment is against the weight of the evidence and is not supported by substantial evidence. To reverse a judgment on the basis that it is against the weight of the evidence, we must have a firm belief that the judgment is wrong. *Murphy*, 536 S.W.2d at 32. As we noted in our discussion of Point I, there is substantial evidence to support the court's determination that Wilson is the most suitable person who is willing to serve and whose appointment serves C.C.S.'s best interests to a stable and permanent placement. While there is evidence favorable to Rash, we do not firmly believe that the judgment appointing Wilson is wrong. Point III is denied.

### CONCLUSION

We affirm the circuit court's judgment appointing Wilson as the guardian of C.C.S.

All Concur.