

# In the
# Missouri Court of Appeals
## Western District

IN THE MATTER OF A.L.R.;  )
  )
K.R.,  )  **WD79123**
  )
  Respondent,  )  **OPINION FILED:  July 26, 2016**
  )
v.  )
  )
A.L.S.,  )
  )
  Appellant.  )

**Appeal from the Circuit Court of Cooper County, Missouri**
The Honorable Keith M. Bail, Judge

Before Division Two:  Karen King Mitchell, Presiding Judge, Cynthia L. Martin, Judge
and Gary D. Witt, Judge

A.L.S. ("Mother") appeals from the trial court's judgment appointing Holly Rehmer and Joseph Rehmer (collectively "the Rehmers") as co-guardians over the person of A.L.R. ("Child") and as co-conservators over the estate of Child.  Mother asserts that the trial court erred: (1) because it failed to apply a clear and convincing standard of proof to its determination that Mother was unable and unfit to serve as the natural guardian of Child; (2) because no substantial evidence supports the determination that

Mother was unable and unfit to serve as the natural guardian of Child; (3) because the determination that Mother was unable and unfit to serve as the natural guardian of Child was against the weight of the evidence; and (4) in denying Mother's motion to continue the hearing scheduled to adjudicate the guardianship petition. Because clear and convincing evidence does not establish that Mother is unable or unfit as those terms are legally defined to serve as Child's presumptive natural guardian, we reverse.

## Factual and Procedural Background[1]

Child was born on November 11, 2014, to Mother, then sixteen years old, and J.R.L.R. ("Father"). At the time of Child's birth, Mother and Father resided with Father's father, K.R. ("Grandfather"), with whom Mother and Father had been living since approximately February 2014. Father was murdered in early June 2015 by a man who had a sexual encounter with Mother.[2] Grandfather made Mother and Child leave his home on June 13, 2015.

Mother and Child moved into the home of Julie Kesler ("Kesler") whose daughter was a friend of Mother's. While living with Kesler, Mother obtained a job working for Casey's General Store in Boonville.

On July 2, 2015, Grandfather filed a petition for appointment of co-guardians and co-conservators ("Petition"). The Petition alleged that Child "is in need of Co-Guardians and Co-Conservators because she is a minor child and the mother is not currently capable of properly caring for the minor child or managing her financial affairs." In particular,

---

[1]When reviewing the trial court's judgment in a guardianship proceeding, "[w]e view the evidence and any reasonable inferences therefrom in the light most favorable to the court's decision and disregard all contrary evidence and inferences." *In re C.C.S.*, 393 S.W.3d 105, 108 (Mo. App. W.D. 2013).

[2]Mother testified that the encounter was not consensual.

2

the Petition asserted: "[Mother] is unfit and unable to properly care for [Child] in that [Mother] is only 17 years of age, has not graduated from school, and is not currently enrolled in school. [Mother] is unemployed, has no vehicle, and is without a permanent residence." The Petition alleged that "[i]t is in the best interests of [Child], a minor child, that Holly E. Rehmer and Joseph A. Rehmer, paternal cousins, be appointed her Co-Guardians and Co-Conservators."

Mother and Child continued to live with Kesler until July 29, 2015, when Kesler asked Mother to leave following a disagreement between Mother and Kesler's daughter. Mother and Child temporarily lived with Joe and Tiffany Rhorer (collectively "the Rhorers") until she could arrange a transfer to the Casey's General Store in Fulton. Mother and Child then moved to Fulton to live with Mother's mother. At the time of the hearing on the Petition, Mother was still living with her mother in Fulton, but Mother had been approved to live in Callaway County public housing and was on the waiting list for an apartment.

On August 10, 2015, Mother filed a motion seeking to continue the August 13, 2015 hearing on the Petition ("Motion for Continuance"). The Motion for Continuance asserted that "Father's death occurred on or about June 7, 2015, and considering the impact of this tragedy on the parties, insufficient time has passed to determine the veracity and weight of [Grandfather's] allegations." Grandfather opposed the Motion for Continuance, arguing that Mother "has failed to provide a stable home and appropriately care for" Child. Child's guardian ad litem expressed no objection to the Motion for Continuance because he had not yet had the opportunity "to make contact with [Mother]

3

for visitation" and because he had "been advised that [Mother] is moving to a more permanent residence." The trial court denied the Motion for Continuance.

During the August 13, 2015 hearing on the Petition, Grandfather presented testimony from six witnesses. In opposing the Petition, Mother testified and presented the testimony of a friend. The testimony presented at the hearing is discussed later in this Opinion.

The guardian ad litem did not present evidence or testify. The guardian ad litem had not visited with Mother before the hearing, and based on the record, does not appear to have visited with the Child before the hearing.

At the conclusion of the hearing, the trial court orally indicated that it intended to "issue[] letters of guardianship of person and letters of conservatorship of estate" to the Rehmers and ordered proposed findings be filed within fifteen days.

On August 20, 2015, the trial court entered its judgment ("Judgment"), which concluded: "[Mother] is unable and unfit to properly care for the minor child. Further, because of the minor child's age and surrounding circumstances, she is in need of care and supervision and the appointment of a Guardian and Conservator is appropriate." The judgment appointed the Rehmers as co-guardians of Child and co-conservators of Child's estate. The Judgment made no provision for visitation between Mother and Child.

Mother filed a motion for new trial or, in the alternative, a motion to terminate guardianship and conservatorship, which the trial court denied.

Mother appeals.

4

**Analysis**

Mother presents four points on appeal. Her first point argues that the trial court committed legal error because it failed to use the clear and convincing evidence standard of proof to determine that Mother is unable and unfit to serve as the natural guardian of Child. Mother's second and third points respectively argue that the trial court erred in concluding that Mother was unable and unfit to serve as the natural guardian of Child because that determination is not supported by substantial evidence and is against the weight of the evidence. Mother's final point contends that the trial court abused its discretion in denying her Motion for Continuance.

Mother's first three points on appeal collectively address whether the evidence, given the required standard of proof, and subject to our standard of review, supports the trial court's legal determination that Mother was unable and unfit to serve as the guardian for Child. We address those points collectively.

**Points One, Two, and Three**

***Missouri's Guardianship Statutes Permit a Parent's Presumptive Role as the Natural Guardian of a Minor To Be Rebutted Where a Parent Is Unwilling, Unable, or Unfit To Serve as Guardian***

Missouri statutes provide for the appointment of guardians "to protect the well-being of individuals who are not able to care for themselves." *In re Link*, 713 S.W.2d 487, 493 (Mo. banc 1986). Missouri's guardianship statutes, which are housed in Chapter

5

475,[3] authorize guardianships for: (i) incapacitated persons; and (ii) minors.[4] We are only concerned in this case with minor guardianships.

The term "guardian" is defined at section 475.010(7) as "one appointed by a court to have the care and custody of the person of a minor." The appointment of a guardian for the person of a minor is one of at least four ways child custody can be adjudicated. *State ex rel. Dubinsky v. Weinstein*, 413 S.W.2d 178, 180 (Mo. banc 1967) (observing that child custody may be adjudicated in: (1) a divorce proceeding pursuant to Chapter 452; (2) a habeas corpus proceeding; (3) a proceeding in the juvenile division of a circuit court pursuant to Chapter 211; and (4) a guardianship proceeding in the probate court pursuant to Chapter 475).

Though Chapter 475 authorizes the appointment of a guardian over the person of a minor, it also recognizes that unless "otherwise provided for by law, the father and mother, with equal powers, rights and duties, while living, and in the case of the death of either parent the survivor, . . . is the natural guardian of their children, and has the custody and care of their persons and education." Section 475.025. Parents are thus the presumptive appropriate natural guardians for their minor children. *Cotton v. Wise*, 977 S.W.2d 263, 264 (Mo. banc 1998). The appointment of a statutory guardian is not authorized, therefore, unless "no natural guardian is fulfilling the parental duties and obligations." *Reece v. Reece*, 890 S.W.2d 706, 710 (Mo. App. W.D. 1995).

---

[3]All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.
[4]Section 475.010(13) defines "minor" as "any person who is under the age of eighteen years."

A guardian other than a parent may only be appointed to have the care and custody of the person of a minor as authorized by statute. *Black v. Black*, 824 S.W.2d 514, 515 (Mo. App. W.D. 1992) (holding that "'[t]he power to appoint guardians is purely statutory'" (quoting *In re Dugan*, 309 S.W.2d 145, 148-49 (Mo. App. 1957))). Letters of guardianship of the person of a minor may be granted:

(1) Where the minor has no parent living;

(2) Where the parents or the sole surviving parent of a minor are unwilling, unable or adjudged unfit to assume the duties of guardianship;

(3) Where the parents or the sole surviving parent have had their parental rights terminated under chapter 211.

Section 475.030.4. In the first and third scenarios, the presumption in favor of parents as natural guardians is plainly negated by death or termination of parental rights. In the second scenario, the presumption in favor of parents as natural guardians may be overcome by evidence that a "parent is unfit, unable or unwilling to take charge of the child." *See In re L.M.*, No. ED102342, 2016 WL 2339702, at *3 (Mo. App. E.D. May 3, 2016).

Here, Mother is Child's sole surviving parent, and Mother's parental rights have not been terminated pursuant to Chapter 211. Mother thus enjoys a rebuttable presumption that she is the appropriate natural guardian and conservator for the person and estate[5] of Child pursuant to section 475.025. Notwithstanding this presumption, the

---

[5]A "parent as natural guardian also has all of the powers of a conservator appointed by a court." Section 475.025. Section 475.010(3) defines "conservator" as "one appointed by a court to have the care and custody of the estate of a minor or a disabled person." A conservator for the entire estate of a minor may be granted: "(1) Where the minor has no parent living; or (2) Where there is a natural guardian of the minor and where the court finds that the best interests of the minor require letters of conservatorship of all of his estate." Section 475.030.3. The appointment of a conservator is not a custodial determination.

trial court found that Mother was "unable and unfit to properly care for the [Child]" pursuant to section 475.030.4(2). The trial court further found that because of Child's "age and surrounding circumstances, she is in need of care and supervision and the appointment of a Guardian and Conservator is appropriate." As a result, Mother's custodial rights to Child and her inherent power to act as conservator over Child's estate have been severed, and can only be restored by the procedures set forth in Chapter 475.

### *Clear and Convincing Evidence Is Required To Establish that a Parent is Unwilling, Unable, or Unfit To Serve as the Presumptive Guardian for a Minor*

Mother's appeal challenges the trial court's appointment of a guardian for Child.[6] Mother first point on appeal claims that the trial court failed to apply the proper standard of proof--clear and convincing evidence--to its determination that she was "unable and unfit" to care for Child pursuant to section 475.030.4(2). "The clear, cogent and convincing standard of proof is met when evidence 'instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.'" *In re Adoption of W.B.L.*, 681 S.W.2d 452, 454 (Mo. banc 1984) (quoting *In re O'Brien*, 600 S.W.2d 695, 697 (Mo. App. W.D. 1980)). Grandfather argues that the proper standard of proof for a determination pursuant to section 475.030.4(2) is a preponderance of the evidence. The preponderance of the evidence standard of proof is met when evidence "is of greater weight or more convincing than the evidence which is offered in opposition to it; that is,

---

[6]Because a parent as the natural guardian inherently possesses the powers of conservator over the estate of a minor according to section 475.025, restoration of Mother as the natural guardian for Child will necessarily require us to vacate the Judgment's appointment of co-conservators, as it is plain on this record that the appointment of co-conservators for Child was solely attendant to the appointment of co-guardians for Child.

8

evidence which as a whole shows the fact to be proved more probable than not." *Vaught v. Vaughts, Inc./S. Mo. Constr.*, 938 S.W.2d 931, 941 (Mo. App. S.D. 1997), *overruled on unrelated grounds by Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003)).

The Judgment (and indeed the entire record) is silent about the standard of proof utilized by the trial court to find that Mother was unable and unfit to serve as Child's natural guardian pursuant to section 475.030.4(2). Absent evidence to the contrary, "[w]e assume that the trial courts of this state know the law." *Dycus v. Cross*, 869 S.W.2d 745, 751 (Mo. banc 1994). Mother's first point on appeal requires us to presume that the trial court used a preponderance of the evidence standard of proof, even though the record is silent on this point. Because Mother's presumption is contrary to our standard of review, point one is denied.[7]

However, to resolve Mother's second and third points on appeal, we are nonetheless required to address the standard of proof required to establish that a parent is unwilling, unable, or unfit to serve as natural guardian for a minor. Mother's second and third points on appeal respectively argue that no substantial evidence supports, and the weight of the evidence does not support,[8] the trial court's determination that she was

---

[7]Grandfather also argued that Mother's challenge to the trial court's purported use of a preponderance of the evidence standard was not preserved for appellate review. Because we otherwise deny Mother's first point on appeal, we need not address this argument.

[8]While both a not-supported-by-substantial-evidence challenge and an against-the-weight-of-the-evidence challenge concern the evidentiary basis of a trial court's judgment, each challenge has a distinct analytical framework. *Sauvain v. Acceptance Indem. Ins. Co.*, 437 S.W.3d 296, 303 (Mo. App. W.D. 2014).

"Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Id.* To successfully bring a substantial-evidence challenge, Mother must: "(1) identify a challenged factual proposition necessary to sustain the judgment; (2) identify all of the favorable evidence supporting that position; and (3) demonstrate why that supporting evidence, when considered with the reasonable

unable and unfit to serve as Child's natural guardian. We review the trial court's judgment in proceedings to appoint a guardian by the standards set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *In re C.C.S.*, 393 S.W.3d 105, 108 (Mo. App. W.D. 2013). "We must affirm the judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* "We view the evidence and any reasonable inferences therefrom in the light most favorable to the court's decision and disregard all contrary evidence and inferences." *Id.*

Though our ***standard of review*** requires us to affirm the Judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law, we conduct this evaluation mindful of the required ***standard of proof***. *In re Adoption of W.B.L.*, 681 S.W.2d at 454. If the standard of proof required to establish that a parent is unwilling, unable, or unfit pursuant to section 475.030.4(2) is clear and convincing evidence, than that "'standard must be considered when determining whether the trial court's judgment is supported by substantial evidence or is against the weight of the evidence.'" *In re S.M.F.*, 393 S.W.3d

inferences drawn therefrom, is so lacking in probative value that the trier of fact could not reasonably believe the proposition." *Id.* All evidence and inferences contrary to the judgment must be disregarded when considering whether substantial evidence supports the judgment. *Id.*

An against-the-weight-of-the-evidence challenge, on the other hand, "presupposes the threshold issue of the existence of substantial evidence supporting a proposition necessary to sustain a judgment." *Id.* at 304. To successfully bring an against-the-weight-of-the-evidence challenge, Mother must: "(1) identify a challenged factual proposition necessary to sustain the judgment; (2) identify all of the favorable evidence supporting that position; (3) identify contrary evidence, subject to the trial court's credibility determinations, explicit or implicit; and (4) prove in light of the whole record that the supporting evidence, when considered along with the reasonable inferences drawn therefrom, is so lacking in probative value that the trier of fact could not reasonably believe the proposition." *Id.* When we consider whether the trial court's judgment is against the weight of the evidence, we do not consider the quantity of evidence. *Id.* Instead, we consider "the probative value of that evidence to induce belief in that proposition when viewed in the context of the entirety of the evidence before the trier of fact." *Id.*

10

635, 643 (Mo. App. W.D. 2013) (quoting *In re T.A.L.*, 328 S.W.3d 238, 246 (Mo. App. W.D. 2010)).  In other words, this court reviews whether clear, cogent, and convincing evidence was presented to support a statutory ground for appointing a guardian over the person of Child under *Murphy v. Carron*.  *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 816 (Mo. banc 2011) (holding that the "Court reviews whether clear, cogent, and convincing evidence was presented to support a statutory ground for terminating parental rights under *Murphy v. Carron*").

Chapter 475 does not describe the standard of proof required to establish that a parent is unwilling, unable or unfit to serve as a natural guardian for a minor pursuant to section 475.030.4(2).[9]  However, "the degree of proof required in a particular type of proceeding 'is the kind of question which has traditionally been left to the judiciary to resolve.'"[10]  *Santosky v. Kramer*, 455 U.S. 745, 755-56 (1982) (quoting *Woodby v. INS*, 385 U.S. 276, 284 (1966)).  No Missouri case has definitively addressed the standard of proof required to establish that a parent is unwilling, unable, or unfit to serve as the natural guardian of a minor pursuant to section 475.030.4(2).[11]  We analyze the question as a matter of first impression.[12]

---

[9]In contrast, section 475.075, which addresses the appointment of a guardian or conservator "on grounds *other than minority*," provides that "[t]he petitioner has the burden of proving incapacity, partial incapacity, disability, or partial disability by clear and convincing evidence."  Section 475.075.1; section 475.075.7 (emphasis added).

[10]*See, e.g., In re B.H.*, 348 S.W.3d 770 (Mo. banc 2011) (evaluating whether legislative directives about the burden of proof required to be established in termination of parental rights cases pass constitutional muster).

[11]A few early Missouri guardianship cases did suggest that a heightened burden of proof is appropriate by observing that "the natural rights of parents to custody of their minor child should not be denied unless it is made manifest to the court that the parent, for some strong and cogent reason, is unfit or incompetent to have such child." *Morris v. McGregor*, 269 S.W.2d 171, 175 (Mo. App. 1954); *see also Edwards v. Engledorf*, 192 S.W.2d 31, 33 (Mo. App. 1946) (holding that parent's "right to the custody of their children by nature and by law . . . should never be denied except for the most cogent reasons").  In *In re Estate of L.G.T.*, 442 S.W.3d 96, 107 n. 11 (Mo. App. S.D. 2014), the Southern District opined in *dicta* that the trial court's use of a clear and convincing standard of proof may

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinding concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quoting *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring)). "[I]n any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." *Santosky*, 455 U.S. at 755. "'In cases involving individual rights, whether criminal or civil, the standard of proof [at a minimum] reflects the value society places on individual liberty.'" *Id.* at 756 (quoting *Addington*, 441 U.S. at 425). This level of certainty is necessary "to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with 'a significant deprivation of liberty.'" *Id.* (quoting *Addington*, 441 U.S. at 425).

---

not have been required, relying on the fact that section 475.075 requires clear and convincing evidence to establish a basis for appointment of a guardian over an incapacitated person and is silent about the standard of proof for minor guardianships. However, no Missouri case has plainly determined whether the required standard of proof to establish that a parent is unwilling, unable, or unfit to serve as a natural guardian pursuant to section 475.030.4(2) is clear and convincing evidence or a preponderance of the evidence.

[12] A volume of *Missouri Practice* suggests that the proper standard of proof for proving that the natural parent is unfit, unable, or unwilling to serve as the natural guardian of a minor is "substantial evidence." 5C JOHN A. BORRON, JR., MISSOURI PRACTICE: PROBATE LAW AND PRACTICE section 1894 (3d ed. 2000). This statement blurs the legal distinction between a standard of proof and our standard of review. "Substantial evidence" is not a quantum of proof that equates to a required burden of proof. Rather, "[s]ubstantial evidence is evidence that, if believed, has some probative force on each fact that is necessary to sustain the circuit court's judgment." *Pasternak v. Pasternak*, 467 S.W.3d 264, 268 (Mo. banc 2015). Where the required standard of proof is clear and convincing evidence, the "substantial evidence" with probative force of a fact necessary to sustain a judgment must be clear and convincing. *In re J.M.*, 328 S.W.3d 466, 471 (Mo. App. E.D. 2010). This is no different in practical operation than the application of our standard of review in criminal cases where an accused enjoys a heightened standard of proof. *See, e.g., State v. Bateman*, 318 S.W.3d 681, 686-87 (Mo. banc 2010) (holding that in reviewing the sufficiency of the evidence, we determine whether sufficient evidence was introduced "for any reasonable juror to have been convinced of guilt beyond a reasonable doubt").

In determining the standard of proof required to satisfy due process, the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), are to be considered:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

The *Eldridge* factors were applied in *Santosky*, a termination of parental rights case, to conclude that "due process require[s] that the proof to sustain termination of parental rights be above the level denoted by the standard of preponderance of the evidence and meet at least the burden of proof of clear and convincing evidence." *In re J.D.K.*, 685 S.W.2d 876, 879 (Mo. App. W.D. 1984) (citing *Santosky*, 455 U.S. 745). "The court concluded that such a standard 'adequately conveys to the fact finder the level of subjective certainty about his factual conclusions necessary to satisfy due process.'" *Id.* (quoting *Santosky*, 455 U.S. at 769).

The holding in *Santosky* reflected the high court's longstanding recognition that parents enjoy a fundamental right to raise their children free from government intrusion. In 1923, the United States Supreme Court recognized that the Due Process Clause's reference to "liberty" protects:

> [N]ot merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and ***bring up children***, to worship God according to the dictates of his conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuant of happiness by free men.

13

*Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (emphasis added). Later, in *Prince v. Massachusetts*, the Court held: "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." 321 U.S. 158, 166 (1944). In short, "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). "[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68-69.

Consistent with *Santosky*, Missouri's termination of parental rights statutes require that grounds for termination must be supported by "clear, cogent and convincing evidence." Section 211.447.6; *see also In re B.H.*, 348 S.W.3d 770, 775 (Mo. banc 2011). Our courts have acknowledged that the heightened standard of proof for petitions seeking termination of parental rights is necessary because such petitions seek to "infringe upon a fundamental right -- the right to raise one's child." *In re T.A.L.*, 328 S.W.3d at 246.

Though a termination of parental rights pursuant to section 211.447.6 yields a ***permanent*** severing of the parent/child bond, clear and convincing evidence is also required by Missouri statute before a juvenile court can assume ***temporary*** jurisdiction over a child based on an allegation that a "child is in need of care because the parents

14

neglected to provide care necessary for the child's well being." *In re Y.S.W.*, 402 S.W.3d 600, 603 (Mo. App. E.D. 2013) (citing section 211.031; Rule 124.06).  Section 211.031 thus recognizes that a parent's fundamental right to raise one's child is no less violated when the custodial relationship is temporarily severed.

The appointment of a guardian over the person of a minor pursuant to section 475.030.4(2) severs a parent's custodial relationship, and thus interferes with the parent's fundamental right to raise one's child, in a manner that is indistinguishable from a termination of parental rights pursuant to section 211.447 or the temporary assumption of jurisdiction over a child pursuant to section 211.031.  On that basis alone, it would seem that fundamental due process requires clear and convincing evidence to establish that a parent is unwilling, unable, or unfit to serve as the presumptive natural guardian for a minor pursuant to section 475.030.4(2).

This preliminary conclusion is reinforced when the effect of appointment of a guardian pursuant to section 475.030.4(2) is compared with the effect of assumption of jurisdiction over a child pursuant to section 211.031.  After a guardian is appointed over the person of a minor pursuant to section 475.030.4(2), there is ***no*** statutory provision for regular review of the necessity for the guardianship.[13]  There is no provision for parental visitation.  There is no mechanism for the provision of services to ameliorate the deficiencies giving rise to the guardianship.  And though a parent can file a petition

---

[13]Section 475.082.1 addresses the "at least annual[]" review a court is required to conduct with respect to the "status of every ward and protectee under its jurisdiction."  However, the review is "for the purpose of determining whether the ***incapacity or disability*** may have ceased and to insure that the guardian . . . is discharging his responsibilities."  *Id*. (emphasis added).  There is no statutory provision requiring the court to regularly assess whether a parent remains unwilling, unable, or unfit to serve as the natural guardian of a minor.

15

seeking to terminate a guardianship "not . . . more than once every one hundred eighty days," the ***parent*** bears the burden to establish by a preponderance of the evidence that the "parent is fit, suitable and able to assume the duties of guardianship," ***and*** that "it is in the best interest[14] of the minor that the guardianship be terminated."  Section 475.083.6; section 475.083.2(3).  This is in stark contrast to the assumption of temporary jurisdiction over a minor pursuant to section 211.031, where Chapter 211 procedures "contemplate[] the return of the child to the home, and impose[] the duty of reasonable effort on the social agency to that end."  *In re A.L.W.*, 773 S.W.2d 129, 134 (Mo. App. W.D. 1989) (citing section 211.183.1).

Thus, while a guardianship is theoretically a temporary "stop-gap measure to provide for the care and custody of a minor for the period of time when the natural parent is unable, unwilling, or unfit to perform his or her parental functions," in practice, a judgment appointing a guardian for a minor "can have the effect of terminating the parental right of custody to a child."  *In re L.M.*, 2016 WL 2339702, at *3.  In fact, Chapter 475 directs that once a statutory condition for the appointment of a guardian for a minor is established, the trial court "shall appoint as guardian . . . of a minor the most suitable person who is willing to serve and whose appointment serves the best interest of the child to ***a stable and permanent placement***."  Section 475.045.3 (emphasis added).  And Rule 124.09, which addresses permanency hearings required by Chapter 211,

_____

[14]The best interest of the child is *not relevant* to determining whether statutory grounds exist to appoint a guardian over the person of a minor child.  *In re L.M.*, 2016 WL 2339702, at *4 ("[T]he question of a child's best interest is not reached unless the trial court has found the parent to be unwilling, unable or adjudged unfit to assume the duties of guardianship.") (citing *Cotton*, 977 S.W.2d at 264-65 (other citations omitted)).  The child's best interests are only relevant according to statute in selecting *who* the guardian should be, assuming a statutory basis for appointing a guardian has been established.  Section 475.045.3.

16

provides that appointment of a guardian is equivalent to a permanency plan and effectively ends the necessity to engage in further reasonable efforts to reunify a parent and child. *See* Rule 124.09(c)(3).

In short, the appointment of a guardian over the person of a minor is potentially as threatening to a parent's fundamental right to raise one's own child as a proceeding to terminate parental rights pursuant to section 211.447. And the appointment of a guardian over the person of a minor is more impactful on a parent's fundamental right to raise one's own child than a proceeding pursuant to section 211.031, given the absence of provision for rehabilitative services and visitation, and given the shift in the burden of proof to the parent to prove fitness and best interests of the child in order to terminate the guardianship.[15] *See Piedimonte v. Nissen*, 817 S.W.2d 260, 269 (Mo. App. W.D. 1991) (holding that "order of guardianship . . . [in effect] terminated the parental right on a finding of ordinary neglect without opportunity for the mother to rehabilitate the neglect or even the prelude of supervision and investigation that the law prescribes for an order of custody on that ground" pursuant to sections 211.031.1(1)(a), 211.181.1(1) & (2), 211.447.2(2) & (3) (RSMo Supp. 1990)). The risk that a parent's fundamental right to raise one's own child will be permanently impaired by the purportedly temporary appointment of a guardian pursuant to section 475.030.4(2) confirms that clear and

---

[15]We express no opinion on the constitutional sufficiency of section 475.030.4(2) on the basis that Chapter 475 affords no process to ameliorate the basis for the guardianship or to regularly review the necessity of the guardianship, and instead shifts the burden to a parent to later disprove the need for the guardianship as well as the best interests of the child, in contrast to the procedures and process described in Chapter 211. *See In re A.L.W.*, 773 S.W.2d at 134 (noting that the procedures set forth in Chapter 211 "rest on the palpable reality that the adjudication of parental neglect which empowers the juvenile court to assume jurisdiction over the child to the temporary exclusion of the parent constitutes prima facie evidence of permanent neglect, and so augurs a termination of the parental right altogether" necessitating "a clear and convincing standard of proof, *as well as other procedures*" in order to satisfy due process (emphasis added)).

convincing evidence is required to establish that a parent is unwilling, unable, or unfit to serve as a minor child's natural guardian.

We recognize that a proceeding to appoint a guardian for a minor may be commenced by "[a]ny person" filing "a petition for the appointment of himself or herself or some other qualified person as guardian of a minor."  Section 475.060.  Thus, a guardianship proceeding pursuant to section 475.030.4(2) is not a "state initiated" proceeding.  *See Santosky*, 455 U.S. at 756 (recognizing that the United States Supreme Court "has mandated an intermediate standard of proof -- 'clear and convincing evidence' -- when the individual interests at stake ***in a state proceeding*** are both 'particularly important' and 'more substantial than mere loss of money'") (quoting *Addington*, 441 U.S. at 424).  However, though the State does not typically initiate minor guardianship proceedings, the State nonetheless possesses a *parens patriae* interest in guardianship proceedings.  *In re Link*, 713 S.W.2d at 493 ("The source of authority for statutory guardianship provisions is the state's parens patriae power.").  The *parens patriae* interest refers to the public policy authorizing government intervention into the parent/child relationship, and gives the government the power "to guard the general interest in youth's well being." *Prince*, 321 U.S. at 166.  As such, the appointment of a guardian pursuant to section 475.030.4(2) is no less an example of State interference with a parent's fundamental right to raise a child simply because the proceeding is initiated by a private party. *See In re Adoption of W.B.L.*, 681 S.W.2d at 454 (noting that clear and convincing standard of proof applies to Chapter 453 proceedings where petitions to adopt can be filed by "any person" pursuant to section 453.010).

18

In summary, to satisfy due process, clear and convincing evidence must establish that a parent is unwilling, unable, or unfit to serve as natural guardian over the person of a minor child pursuant to section 475.030.4(2). "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents. . . . Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." *Santosky*, 455 U.S. 753; *see also*, *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004)).

***The Evidence Did Not Clearly and Convincingly Establish that Mother Is Unable or Unfit To Serve as Child's Natural Guardian as Those Terms Are Legally Defined***

We now address whether clear and convincing evidence established that Mother was unable or unfit to serve as Child's natural guardian pursuant to section 475.030.4(2). To do so, we must first determine the meaning of "unable" and "unfit." Statutory interpretation is a question of law we review *de novo*. *Lombardo v. Lombardo*, 35 S.W.3d 386, 388 (Mo. App. W.D. 2000).

Neither "unable" nor "unfit" is defined in Chapter 475. *See In re Estate of L.G.T.*, 442 S.W.3d 96, 111 (Mo. App. S.D. 2014); *In re T.A.P.*, 953 S.W.2d 638, 642 (Mo. App. S.D. 1997). We give the undefined words in a statute "their plain and ordinary meaning as derived from the dictionary." *Miss Diana's Sch. of Dance, Inc. v. Dir. of Revenue*, 478 S.W.3d 405, 408 (Mo. banc 2016). In doing so, we are required to assign definitions that afford each word a distinct meaning. *See State v. Payne*, 250 S.W.3d 815, 819-20 (Mo. App. W.D. 2008) (holding that where a statute defines "deadly weapon" by listing

19

examples, the definition ascribed to each example must be distinct so as not to subsume other examples, as "'words in a statute are presumed to have meaning, and any interpretation rendering statutory language superfluous is not favored'") (quoting *Schoemehl v. Treasurer of State*, 217 S.W.3d 900, 902 (Mo. banc 2007)). It is also "appropriate to take into consideration statutes involving similar or related subject matter . . . even though the statutes are found in different chapters." *McCoy v. The Hershewe Law Firm, P.C.*, 366 S.W.3d 586, 594-95 (Mo. App. W.D. 2012).

"Unable" is defined by the dictionary to mean "[n]ot able; incapable; unqualified; incompetent." Webster's New International Dictionary, p. 2757 (2d ed. 1947). "Unfit" is defined by the dictionary to mean "1. Not fit; unsuitable. 2. Not fitted; insufficiently adapted . . . . Unfit commonly implies inherent or natural want of suitability for something." Webster's New International Dictionary, p. 2774 (2d ed. 1947).

Though the dictionary definitions of "unable" and "unfit" arguably overlap, the terms are susceptible of distinct meanings. *Payne*, 250 S.W.3d at 819-20. "Unable" as used in section 475.030.4(2) refers to a parent who is incompetent or not capable to serve as a guardian despite a desire and intention to do so. *See In re Moreau*, 18 S.W.3d 447, 453 (Mo. App. S.D. 2000) (holding that if a parent "lack[s] the independent ability to provide for the care, health, and needs" of the child despite his or her best intentions, then the parent is considered unable to fulfill his or her role as the child's natural guardian). "Unfit" as used in section 475.030.4(2) refers to a parent who is not suitable, or is insufficiently adapted, to serve as a guardian because of circumstances the parent could remediate. We are also guided in defining "unfit" by use of the same term in section

20

211.447.5(6). *McCoy*, 366 S.W.3d at 594-95. Section 211.447.5(6) provides that a juvenile officer can initiate a petition to terminate parental rights if:

> The parent is ***unfit*** to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse including, but not limited to, specific conditions directly relating to the parent and child relationship which are determined by the court to be of a duration or nature that ***renders the parent unable for the reasonably foreseeable future to care appropriately for the ongoing physical, mental, or emotional needs of the child***.

(Emphasis added.) "Unfit" as used in section 475.030.4(2) is thus calculated to require serious parental deficiencies that interfere with the ability to provide a child with appropriate care, and that could be ameliorated, though that is not likely in the foreseeable future. *See In re Estate of L.G.T.*, 442 S.W.3d at 111 ("[P]arental unfitness means a personal deficiency or incapacity which has prevented, or probably will prevent, performance of a reasonable parental obligation in child rearing . . . . ").

In assessing fitness or ability to serve as a natural guardian, any number of factors have been identified as relevant, including "the stability in a parent's life, the care the parent would be able to provide on a daily basis, the environment in which the child would be raised, the amount of effort made by the parent to furnish any financial support, and the parent's mental health." *In re L.M.*, 2016 WL 2339702 at *5. Courts may also consider "the moral environment to which the child will be subjected, but the analysis is not about condemnation nor approval of a moral standard." *Id.* However, the mere presence of these factors is not enough, standing alone, unless they clearly and convincingly meet the legal definition of "unable" or "unfit." Moreover, our courts have clearly held that the inquiry must be "whether the [parent's] conduct is detrimental to the

21

child's welfare," and the evidence must establish that "the parent's conduct has had or will have an adverse impact on the child." *In re L.M.*, 2016 WL 2339702 at *5; *see also In re Estate of L.G.T.*, 442 S.W.3d at 111 (holding that parent's conduct must have caused, or be demonstrated to probably result in, detriment to the child's well-being).

In addition, in considering factors bearing on a parent's ability or fitness, a court is not permitted to compare or weigh the relative quality of care a child would receive with a proposed guardian -- a "best interest" analysis that has no place in determining whether statutory grounds exists to sever a parent's custodial rights pursuant to section 475.030.4(2). *In re L.M.*, 2016 WL 2339702, at *4 ("[T]he question of a child's best interest is not reached unless the trial court has found the parent to be unwilling, unable or adjudged unfit to assume the duties of guardianship.") (citing *Cotton*, 977 S.W.2d at 264-65 (other citations omitted)); *In re Estate of L.G.T.*, 442 S.W.3d at 112 (holding that the determination of parental fitness or ability to serve as a presumptive natural guardian cannot be made "by comparing the relative merits of a natural parent with those of [a] proposed guardian").

With these definitions and standards in mind, we turn to the evidence in this case. Grandfather's Petition alleged that "[Mother] is unfit and unable to properly care for [Child] in that [Mother] is only 17 years of age, has not graduated from school, and is not currently enrolled in school. [Mother] is unemployed, has no vehicle, and is without a permanent residence." In keeping with the allegations in the Petition, Grandfather testified about Mother's age; that she had lived with him from early 2014 until she was asked to leave on June 13, 2015; that she has twice moved since that date; that she was

22

unemployed when she left his home; that her highest level of education completed was the ninth grade; and that she owned no real estate. Grandfather also testified that he was aware a drug screen ordered by the court at his request after the Petition was filed came back negative, though he still suspected Mother had abused prescription drugs in the past.[16] On cross examination by the guardian ad litem, Grandfather conceded he had seen no evidence of drug use by Mother, and that although she liked to sleep late, during the times she was sleeping, Child would also be sleeping.

Grandfather's brother (Father's uncle) ("Uncle") testified that he was at Grandfather's house sometime during the day after Father died, and that he observed Mother place Child in a recliner with a bottle, and that later Mother put the Child on a full-size bed to sleep, after which Mother went outside for a few hours.[17] Uncle testified that Mother fed Child in the same manner the next morning.

Grandfather's sister (Father's aunt) ("Aunt") testified that on the day of Father's funeral, she witnessed Mother having an altercation with her own mother in front of Father's casket.[18] She testified that two days later when Mother was moving out of Grandfather's home, she observed a crib in the room Mother had shared with Father filled with trash bags, and saw a dirty diaper in the room and clothes in the bathroom sink.

---

[16]Mother did not object to this testimony, which arguably exceeded the allegations in Grandfather's Petition. Though not raised by Mother at trial or on appeal, and thus not material to the result reached by our Opinion, we observe that guardianship petitions should be bound by the same due process restrictions applicable to petitions filed pursuant to section 211.031 to assume jurisdiction over a child. "It is well established that litigants facing deprivations are guaranteed notice of, and the opportunity to defend against, the charges against them. Due process mandates that parents in juvenile court facing allegations of abuse or neglect are entitled to the same notice of the specific allegations of abuse or neglect against them, and the opportunity to defend against those charges." *In re K.S.-W.*, 412 S.W.3d 452, 457 (Mo. App. W.D. 2013) (quoting *In re Y.S.W.*, 402 S.W.3d 600, 604 (Mo. App. W.D. 2013)).

[17]*See supra* note 16.

[18]*See supra* note 16.

23

Kesler testified that one of her daughters had been friends with Mother and that she cared for Child occasionally before Father's death. Kesler testified that Mother and Child came to live with her on June 13, 2015, and stayed until July 29, 2015. She testified that Mother and Child shared a room with Kesler's daughter, and that Child slept in her crib.[19] When asked to described Mother in general terms, Kesler testified that "[s]he's a very young mom, a very inexperienced mom that didn't have much upbringing to show how to be a mom, so in my opinion there's a lot of work to be done." Specifically, Kesler indicated that Mother was unaware that Child needed to be on a regular feeding schedule at a certain age, and that Kesler "tried to steer her and give her the direction on how to feed" Child. Kesler said that Mother followed the directions that she provided. Kesler said that sometimes Mother would get up in the night with Child, and that sometimes she or her daughter would. Kesler said that Mother had Child's ears pierced, and that Mother did not regularly turn the earrings or put solution on the ears. Kesler said that she had to have conversations with Mother about her housekeeping skills because she "left stuff lying around." Kesler said that because Mother did not have a job initially, Mother was unable to buy necessary supplies for Child. Kesler supplied diapers, wipes, formula and baby food. Mother started working at Casey's General Store while she was living with Kesler, and Kesler provided Mother with transportation to and from work. Kesler said that Mother reported having taken "a pill" once, likely a Xanax or a Vicodin, though she could not recall when. Kesler expressed concern that Mother was having conversations with a 28-year-old man who was in prison--a man Mother's mother

---

[19]All of Kesler's testimony is subject to the concern addressed in *supra* note 16.

knew--and that Kesler believed Mother had sent pictures of Child to the man. Finally, Kesler testified that Mother and Child left her home in late July after Mother had an altercation with Kesler's daughter. Kesler was aware that Mother went to live with the Rhorers.

The Rehmers both testified that they consented to be co-guardians, and would be willing to allow Mother to have supervised contact with Child. Holly Rehmer admitted that when initially approached by Grandfather about serving as a guardian, she felt Father's family was being unfair to Mother, though she testified that her opinion had changed.

Mother testified that she was directed to move out of Grandfather's house after Father died. Mother believes Grandfather blames her for Father's murder. She testified that she then lived with Kesler until she and Kesler's daughter had a verbal altercation. She explained that after leaving Kesler's home, she lived temporarily with the Rhorers until she could arrange to transfer her employment from the Casey's General Store in Boonville to the Casey's General Store in Fulton. Then she and Child moved in with Mother's mother in Fulton. Mother testified that she has applied for public housing in Callaway County, and that she has been approved and is on a wait list. Mother testified that her mother's house has three bedrooms, and that Child has all the furnishings she needs. She testified that she has extended family and friends in Callaway County who are supportive of her. Mother testified that she now has a working vehicle, and in fact owned the same car when the Petition was filed, though it was in need of minor repairs, and Mother did not have, at that time, her driver's license. Mother testified that the car is

25

now fully insured, and that she has a driver's license. Mother testified she has never taken pain medication without a prescription, and that after Grandfather filed the Petition and accused her of drug use, she took a drug test which was negative. Mother said that while she lived with Grandfather, she was Child's primary caregiver, as Father worked every day with Grandfather. Mother testified that she had been working at Casey's General Store for five weeks, and expects to go full time once her transfer to Fulton is finalized. Mother testified that both she and Father dropped out of high school when she learned she was pregnant, but that she plans one day to get her GED. Mother advised that she has WIC assistance, and very much wants to maintain custody of Child.

On cross examination, Mother acknowledged that Father was killed by a man with whom she had a nonconsensual sexual encounter. Mother admitted that her relationship with her mother had its "ups and downs." Mother acknowledged that she has a lot to learn when it comes to being a mother. She acknowledged that even though she is on WIC assistance, she has still accepted assistance from Kesler and others. Mother acknowledged missing three WIC appointments, and explained that the most recent miss was because of her transfer from the Cooper County WIC office to the Callaway County WIC office. Mother explained that two other appointments were missed while Father was alive because she did not yet have her driver's license, and Father was working. Mother testified that all three missed appointments have been made up. Mother admitted that she allowed Child to pet a baby alligator on a leash at the Callaway County Fair. Mother testified that while at Grandfather's house, Child's crib was always clean, except during her move. Mother testified that she believed her mother's acquaintance in prison

26

was serving time for a third DWI offense, and denied any knowledge about the man's other criminal history.

The guardian ad litem did not present evidence or testify. The guardian ad litem had not visited with Mother, and based on the record does not appear to have visited with the Child, before the hearing. Notwithstanding, the guardian ad litem made the following recommendation to the trial court:

> I think, certainly at some point I think [Mother] may well be in a position that she can provide the care for [Child]. However, I think there certainly is enough evidence to indicate that there were times when she did not do that. Really from the time she left Ms. Kesler's place, it's only been from the 29th to the 13th of August. *I think that's insufficient time to establish that [Mother] can actually set up a stable situation to provide care. On that basis, I think probably a guardianship is appropriate*.[20] I think there's not much question that the Rehmers are suitable people to serve as guardians and conservators.

(Emphasis added.)

This evidence, viewed in the light most favorable to the Judgment, and recognizing the trial court was free to believe or disbelieve Mother's testimony, would have permitted the trial court to clearly and convincingly conclude that Mother: was a high school dropout; relied on help for transportation and in providing supplies for Child; was a poor housekeeper; had a rocky relationship with her own mother; was young and inexperienced in raising a baby; communicated with an incarcerated man; permitted Child to pet an alligator at a county fair; may have once taken prescription medications; and had a sexual encounter with the man who murdered Father. Though the aforesaid

---

[20]The guardian ad litem's "recommendation" in favor of appointing a guardian plainly disregarded that Mother did not bear the burden to prove that she was not unable or unfit to serve as Child's natural guardian.

27

facts are clearly and convincingly established, they do not clearly and convincingly equate with the legal definitions of "unable" or "unfit."

First and foremost, there is no evidence that Mother's conduct caused or was likely to cause, detriment to Child's well-being. *In re L.M.*, 2016 WL 2339702, at \*5 (holding that father's romantic history was insufficient to constitute substantial evidence of unfitness because no evidence was presented to establish that the romantic relationship had an adverse effect on the child). In the absence of such evidence, Mother's conduct cannot be said to have rendered her "unable" or "unfit" to serve as Child's natural guardian as a matter of law.

Second, the aforesaid facts that could have been found by the trial court do not clearly and convincingly establish that Mother is "unable" to serve as natural Guardian as a matter of law. There is no evidence that Mother is incompetent or not capable to serve as Child's natural guardian despite her desire and intention to do so. Rather, Mother had been serving in the role as Child's natural guardian at all times since Child's birth, and desired to continue to do so.

Finally, the aforesaid facts that could have been found by the trial court do not clearly and convincingly establish that Mother is "unfit" to serve as Child's natural guardian as a matter of law. *Grissum v. Reesman*, 505 S.W.2d 81, 86 (Mo. 1974) (noting clear and convincing test means "the court should be clearly convinced of the affirmative of the proposition to be proved"). The evidence does not establish that Mother suffered from serious parental deficiencies that interfere with her ability to provide Child with appropriate care that will not likely be ameliorated in the foreseeable future.

28

Child may well be in a "better" living environment with the co-guardians. That is not relevant, however, to determining whether Mother was unable or unfit to serve as Child's presumption natural guardian. *In re L.M.*, 2016 WL 2339702, at \*4 ("[T]he question of a child's best interest is not reached unless the trial court has found the parent to be unwilling, unable or adjudged unfit to assume the duties of guardianship." (citing *Cotton*, 977 S.W.2d at 264-65)); *In re Estate of L.G.T.*, 442 S.W.3d at 112 (determination of parental fitness or ability to serve as a presumptive natural guardian cannot be made "by comparing the relative merits of a natural parent with those of [a] proposed guardian").

This case underscores the potential for abuse of section 475.030.4(2) if "unable" and "unfit" are read so liberally as to permit the presumption in favor of a parent as natural guardian to be overcome by generalized parenting skill criticisms that could be levied against thousands of young, undereducated, or impoverished parents. *Cf. In re T.A.L.*, 328 S.W.3d 238, 246 (Mo. App. W.D. 2010) (noting that we are to "strictly constru[e] all statutes in favor of preserving the parent-child relationship"). The facts in this case would not have supported the termination of Mother's parental rights based on a finding of parental unfitness pursuant to section 211.447.5(6). Yet the effect of the Judgment is to put Mother at grave risk for that very outcome.

Even if we assume, *arguendo*, that the facts in this case would have supported a finding of "neglect"[21] sufficient to assume jurisdiction over Child pursuant to section

---

[21]"Neglect" as used in section 211.031 has been routinely interpreted by our courts to mean the "failure by the parents to supply the minimum quality of care which the community will tolerate." *In re C.F.B.*, 497 S.W.2d 831, 837 (Mo. App. 1973); *see also In re G.C.*, 50 S.W.3d 408, 411 (Mo. App. E.D. 2001). "Neglect" sufficient to

211.031 (a matter as to which we express no opinion),[22] Chapter 211 would have afforded Mother access to services and visitation with Child, with the statutory goal of reunification and a burden on the State to disprove the viability of that goal. As first emphasized in *Piedimonte*, 817 S.W.2d at 269, section 475.030.4(2) guardianship proceedings should not be permitted to substitute for section 211.031 proceedings designed to redress alleged parental neglect and which afford a parent an opportunity for rehabilitation, the prelude of supervision and investigation, and a burden which must be sustained by the State to establish that reasonable efforts have been exhausted to facilitate reunification. "There is no statutory ground for appointment of a guardian because of a parent's neglect of a child." *Black v. Black*, 824 S.W.2d 514, 515 (Mo. App. W.D. 1992). To permit section 475.030.4(2) to be employed to sever the parent-child relationship for parental conduct that at worst reflects parental neglect "arrogates the presumptive exclusive jurisdiction that the Juvenile Code reserves to the juvenile court to determine the need of a child for care and treatment because of the neglect of a parent, but without its meliorative methods."[23] *Piedimonte*, 817 S.W.2d at 269.

---

support assumption of jurisdiction over a child pursuant to section 211.031 is plainly a lesser standard than "unable" or "unfit" required to negate the presumption in favor of a parent to serve as natural guardian pursuant to section 475.030.4(2).

[22]Counsel for the co-guardians advised during oral argument that in her view, the facts in this case would not support the assumption of jurisdiction over Child based on parental neglect pursuant to section 211.031.

[23]Section 211.031.1 provides that "the juvenile court . . . shall have ***exclusive original jurisdiction*** in proceedings: (1) Involving any child . . . who is alleged to be in need of care and treatment because: (a) The parents . . . of the child . . . neglect or refuse to provide proper support, education which is required by law, medical, surgical or other care necessary for his or her well-being . . . ; [or] (b) The child . . . is otherwise without proper care, custody or support." (Emphasis added.) Section 211.051 provides: "Nothing contained in this chapter deprives other courts of the right to determine the legal custody of children upon writs of habeas corpus or to determine the legal custody or guardianship of children when the legal custody or guardianship is incidental to the determination of causes pending in other courts. Such questions, however, may be certified by another court to the juvenile court for hearing, determination or recommendation." Missouri courts have not fully explored the proper relationship between Chapter 211 and section 475.030.4(2). We are nonetheless mindful that use of section 475.030.4(2) as a

The Judgment is legally erroneous. Mother's second and third points on appeal are granted. The appointment of co-guardians for Child is not supported by clear and convincing evidence that Mother is either unable or unfit, as those terms are legally defined, to serve as natural guardian for Child. Child must be restored to Mother's custody.

## Point Four

Our resolution of Mother's second and third points on appeal renders it unnecessary to address her fourth point on appeal which is denied as moot.

## Conclusion

We reverse and vacate the Judgment and remand this matter to the trial court with instructions to dismiss the Petition with prejudice and to order Child to be immediately returned to Mother's custody.

*Cynthia L. Martin*
_____
Cynthia L. Martin, Judge

All concur

---

substitute for assumption of jurisdiction of a child based on allegations of parental neglect pursuant to section 211.031 raises serious due process implications for reasons alluded to in this Opinion.

31