In the Matter of T.A.P., a Minor.

D.L.M., Petitioner–Respondent,

v.

S.M.P., Respondent–Appellant.

No. 21125.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 22, 1997.

Austin L. Mitchell, Salem, for Respondent–Appellant.

No Appearance for Petitioner–Respondent.

SHRUM, Judge.

This case involves T.A.P., a minor child. A trial court appointed T.A.P's Maternal Grandmother as his guardian and conservator. The father of T.A.P. appeals the order. The mother of T.A.P. does not appeal.

 In this non-jury case, review is under Rule 73.01(c).[1] As this rule is construed, we must affirm the trial court's decision, unless there is no substantial evidence to support it,

---

1. All references to rules are to Missouri Rules of Civil Procedure, 1996 unless otherwise indicated.

it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Estate of Williams*, 922 S.W.2d 422, 423[1] (Mo.App.1996).

T.A.P. was born July 7, 1993. Father and Mother were teenagers when T.A.P. was conceived. They never married; however, there was no dispute about Father's paternity.

When first born, T.A.P. lived "off and on" in the home of his Paternal Grandparents. When not in that home, T.A.P. was with Maternal Grandmother or Mother.

In March 1994, Maternal Grandmother petitioned for appointment as guardian and conservator of T.A.P. She alleged that both parents were "unfit, unwilling, or unable to assume the duties of guardianship." At trial, Mother conceded her inability to properly act as T.A.P.'s natural guardian; consequently, most of the evidence focused on Father's activities and the care given to T.A.P.[2]

After T.A.P.'s birth, Paternal Grandparents were "mostly" his "primary financial provider." Beginning in March 1994 and continuing through April 26, 1996, T.A.P. lived in Paternal Grandparents' home during the week and visited with his Maternal Grandmother on week-ends. Whenever T.A.P. needed medical care, Paternal Grandparents "took on that responsibility."

Some evidence at trial suggested that T.A.P. had developmental problems. He was described as "slow on some things," not talking as he should, and prone to "point and utter rather than talk." Additionally, there was testimony that T.A.P. ate with his hands without using a spoon or fork, was frequently fed off a bottle (although three years old), was not out of diapers, and had difficulty interacting with other children. However, both Paternal Grandmother and Father testified that they did not consider T.A.P.'s development as unusually slow.

After the birth of T.A.P., Father lived with his parents occasionally, perhaps "half the time." As one witness described it: "[H]e's there and then he isn't." Once he left and moved in with friends at Salem. In September 1995, Father moved to Rolla after marrying a high school student. Father explained why he moved: "My wife and my parents ... didn't like each other.... [L]iving with my parents with my wife was not feasible."

When Father moved to Rolla, he left T.A.P. with Paternal Grandparents. His explanation for leaving the child was as follows: "I was seeking employment and I had no daycare for him." Moreover, his wife was enrolled in high school at the time and could not care for T.A.P.

While at Rolla, Father found employment but quit after earning a "couple hundred dollars." He left that job because it had been misrepresented to him. Another job at Rolla "didn't work out" because "[i]t was traveling work" and Father "didn't have a reliable car at the time."

Before going to Rolla, Father had worked in St. Louis but quit that job after two or three weeks. Before Rolla and St. Louis, Father worked at a video store in Salem, Missouri, for three or four months. The video store job was Father's sole employment history in the Salem area. He claimed that he was unsuccessful in trying to find a job at Salem.

At some point—when is not clear from the record—Father worked at a Hardee's restaurant in Washington, Missouri. During that employment, he filed a worker's compensation claim based on a diagnosis of "right carpel tunnel syndrome." Father's claim was settled about a year and a half before trial for $9,000 to $10,000. No evidence was presented on what was done with that money.

Father moved from Rolla three months after going there because he was told of job opportunities around the Lake of the Ozarks. Father moved with his wife to Eldon, Missouri. At Eldon they lived with Father's friend and his family. Father found employment in Jefferson City and worked for a month and a half. While working he gave his friend $25 per week to help "put groceries on the table." Father quit his job, how-

---

**2.** The evidentiary hearing on Maternal Grandmother's petition for appointment as guardian/conservator was held on April 26, 1996.

ever, because the "engine locked up" on his car and he had no way to get to work. Father's total earnings in 1995 were about $2,000.

Two or three weeks before trial, Father returned to his parents' home. He and his wife had separated two months earlier, in part because of money problems and his inability to support her. At the time of trial, Father was not employed. He was, however, attending "Columbia College at Fort Leonard Wood" majoring in psychology. He was using Veterans' Administration benefits (a benefit derived through his father who is a disabled veteran) and a Pell grant to finance this college work. Since Father's automobile was not running, his only transportation was Paternal Grandparents' car. When asked about his efforts to get a home of his own, Father answered: "I'm on the waiting list for Dent County Housing Assistance." Asked if his wife would move into such housing if it became available, Father answered he did not know what she would do.

Julie Sayler, a Court Appointed Special Advocate (CASA), began her "case study" in September 1995. She visited in Maternal Grandmother's home approximately twelve times and a like number in Paternal Grandparents' home. From those visits, Mrs. Sayler concluded that T.A.P. would be better off living with Grandparents—either set—than with Father. She viewed Father as unstable. When asked "[h]ow much caring for the child has.... [Father] done[,]" Mrs Sayler answered: "Not very much."

Without stating its reasons, the trial court appointed Maternal Grandmother as guardian and conservator of T.A.P. This appeal by Father followed.

Father presents two points relied on. They read as follows:

"The trial court erred in issuing letters of guardianship ... when the evidence substantiated that the parent is fulfilling the duties and responsibilities of [natural] guardian because § 475.030–4, RSMO 1994, is applicable only when the parent (has not been but) is seeking 'to assume'

the duties of guardianship, and as such, the trial court misapplied the law."

"The trial court erred in issuing letters of guardianship and conservatorship under Chapter 475, RSMo 1994, when the evidence substantiated that the parent, who had not been adjudged unfit, who was willing to continue the duties and responsibilities of [natural] guardian, and who was able to continue the duties and responsibilities of [natural] guardian, any one of which must be shown to the contrary under § 475.030–4, and as such, the issuance of such letters is without evidentiary support."

Although structured differently, both points claim that the evidence was insufficient to support a finding that Father was unable, unwilling, or unfit to perform the duties of a natural guardian; consequently, Father argues that the trial court erred in using § 475.030.4 to appoint a statutory guardian/conservator for T.A.P.[3]

Section 475.025 provides that a father, mother, both, or a survivor of the two, are natural guardians of their children. *See Reece v. Reece,* 890 S.W.2d 706, 709 (Mo.App. 1995). Another part of the probate code, § 475.045, provides that parents of a minor have priority to be appointed guardian or conservator, except as provided in § 475.030. In § 475.030 the legislature authorizes appointment of someone other than a parent as guardian in certain instances. One such instance is "[w]here the parents ... of a minor are unwilling, unable or adjudged unfit to assume the duties of guardianship." § 475.030.4(2).

In analyzing these statutes, Judge Breckenridge of the western district has written:

"When reading the three statutes in pari materia, letters of guardianship for a minor should not issue unless there is no parent available, willing or able to fulfill the parental role in caring for a child and providing for that child's needs as natural guardian. It is only when no natural guardian is fulfilling the parental duties

---

**3.** All references to statutes are to RSMo 1994 unless otherwise indicated.

and obligations is the appointment of a statutory guardian necessary."

*Reece*, 890 S.W.2d at 710[6].

■■■ The guardianship statutes are consistent with other situations involving child custody in that they create a rebuttable presumption that a minor child's best interest is served by having custody in the parent. *See Williams*, 922 S.W.2d at 424[2]. This presumption may be overcome, however, by proof that the parent is unfit or incompetent to take care of the child. *Id.* When proof is made that no natural parent is fulfilling parental duties, then appointment of a statutory guardian is necessary. *In re D.L.J.*, 916 S.W.2d 437, 438 (Mo.App.1996). Consequently, if there is sufficient evidence here that Father was unfit, unwilling, or unable to take charge of T.A.P., then any presumption in favor of him is gone and the trial court properly appointed Maternal Grandmother as guardian. *Williams*, 922 S.W.2d at 424.

Since the trial court appointed Maternal Grandmother as statutory guardian, its judgment implies that Father was either "unwilling," "unable," or "unfit." Before reviewing the evidence itself, we examine what is meant by the terms "unwilling," "unable," or "unfit."

■■■ In the context of Missouri's guardianship statutes, the terms "unwilling" and "unable" are not well defined. One commentator notes that the terms unwilling and unable "essentially refer to a species of abandonment of the child." 4B JOHN A. BORRON, JR., MISSOURI PRACTICE, PROBATE AND SURROGATE LAWS MANUAL 20 (1995). Where termination of parental rights is at issue, Missouri courts describe abandonment as: (1) a parent voluntary and intentionally relinquishing the custody of the child to someone else with the intent to never claim parental rights, nor perform parental duties; or (2) a parent withholding intentionally from the child, without a just cause or excuse, his or her presence, care, love, and protection, as well as maintenance and the opportunity for displaying filial affection. *H.W.S. v. C.T.*, 827 S.W.2d 237, 239–240 (Mo.App.1992); *S.C.H. v. C.W.H.*, 587 S.W.2d 945, 947 (Mo.App. 1979).

■■■ The term "unfit" was considered by this court most recently in *Estate of Williams*. 922 S.W.2d at 424–25. After investigating definitions from other jurisdictions, we found that the term "unfit" has been given a broad definition in child custody cases and courts have been given considerable discretion in applying the term. *Id.* It has also been said that "the word 'unfit' imports parental neglect." 4B JOHN A. BORRON, JR., MISSOURI PRACTICE, PROBATE AND SURROGATE LAWS MANUAL 20 (1995). The term neglect has normally focused on physical harm or deprivation, but the term primarily has been seen to involve a failure to perform parental duties imposed by law and by conscience. *H.W.S.*, 827 S.W.2d at 240; *G.S.M. v. T.H.B.*, 786 S.W.2d 898, 900[3] (Mo.App.1990). "[E]vidence of neglect [of a child] can demonstrate a parent's unfitness to serve as guardian, provided the neglect relates to the parent's duties as natural guardian." *Reece*, 890 S.W.2d at 711[12].

■■■ We now look at whether there is sufficient evidence to support the trial court's implicit finding that Father is either unwilling, unable, or unfit to serve as guardian/conservator. Since no specific findings of fact were made here, all factual issues are found as resolved according to the result reached by the trial court. Rule 73.01(a)(3). Here, as in other court-tried cases, due regard must be given the opportunity of the trial judge to assess the credibility of witnesses. Rule 73.01(c)(2). Witness credibility is generally a consideration for the trial court which may disbelieve testimony even when uncontradicted. *Williams*, 922 S.W.2d at 423. A trial judge is in a better position to weigh the credibility of the parties and decide their sincerity, character, and other intangibles that ordinarily cannot be gleaned from the record. *Id.*

We find sufficient facts in this record to support a finding that Father was unwilling, unable, or unfit to fulfill his parental duty as natural guardian; therefore, appointment of a statutory guardian for T.A.P. is authorized by § 475.030.4(2). We summarize those facts as follows.

First, the facts supported a finding that Father did not fulfill his duty to financially support and maintain T.A.P. and abdicated his responsibility in that regard to Paternal Grandparents. In 1995, Father earned $2,000, yet in his testimony at trial Father provided no details on how he spent his income nor did he ever say he used any part of his earnings to support his son. Father offered no evidence on what his earnings were in 1993 or 1994 nor did he testify regarding what contributions, if any, he made to his son's support in those years. Except Father's right carpel tunnel syndrome (for which he was compensated) there was no evidence that he suffered from any health or mental conditions that prevented him from working. Moreover, Father adduced no details tending to show that he used any of his earnings or worker's compensation settlement to support his son.

While living with friends in Eldon, Father only contributed $25 per week for room and board for his wife and him. Father admitted that his wife left him, at least in part, because of "money troubles" and his failure to support her. Since the birth of T.A.P., Father had been employed sporadically and only for short periods. A court could reasonably have interpreted Father's stated reasons for leaving various employments as no more than rationalizations to show that he was not at fault for leaving employment. Father chose to become a full-time student without explanation of why he could not also work full-time or at least part-time. Although Paternal Grandmother testified Father supported T.A.P. when he worked, the trial court was entitled to disbelieve such testimony. Paternal Grandmother also admitted that "mostly" she and her husband were the primary financial providers for T.A.P., and Father never mentioned spending a single penny of his earnings or worker's compensation money to support his son. Moreover, once Father became a full-time student and remained unemployed, Paternal Grandparents were obviously bearing all the financial cost of caring for T.A.P. From these facts the court could reasonably have inferred that Father intentionally placed himself in a position of having no income to support T.A.P., that Father was not willing to work and provide for the financial needs of his child, and that Father had relegated the performance of his duty of support to Paternal Grandparents.

Second, there was evidence from which the trial court could have found that Father, by placing T.A.P. in Paternal Grandparents' physical custody, has not shown the willingness or the ability to care for T.A.P.'s day-to-day physical needs. In the two-year period before trial, Father was only at the home where T.A.P. resided "about half the time." When not at his parents' home, Father was either with friends in Dent County or living with his wife in other counties. During those periods, Paternal Grandparents were the primary caretakers for T.A.P. Obviously Father was not meeting T.A.P.'s day-to-day physical needs during his extended absences from T.A.P.'s home. Moreover, whenever T.A.P. needed medical care, it was Paternal Grandparents who "took on that responsibility."

■ It is true that a parent may, if there is good cause, temporarily leave a child in the custody of a third party without abandoning a child, *In the Interest of M.J.A.*, 826 S.W.2d 890, 897[5] (Mo.App.1992). Yet, leaving a child with a responsible person does not, standing alone, compel a finding that such parent has by that action fulfilled his or her duty. Judge Breckenridge explains this concept in *Reece*:

> "One distinction between a natural guardian and a statutory guardian is that a parent's duty to provide for a child is a personal obligation which cannot be satisfied when, by chance, another provides that service in the parent's stead. For example, when parents are tried for criminal non-support of their children, '[t]he fact the minor child does not suffer deprivation of necessary food, clothing, lodging, medical or surgical attention, *or that such needs are being supplied by another,* does not abrogate the parent's obligation under the statute.' *State v. Morovitz,* 867 S.W.2d 506, 508 (Mo. banc 1993) (emphasis added). Likewise, under the law of parental abandonment, it would be unfathomable if 'a parent could have absolutely no contact with his child, spend no money on the cost

of raising his child, and take no responsibility for rearing his child and yet still not abandon his child because he first asked someone else to take care of the child.' *H.D. v. E.D.*, 629 S.W.2d 655, 658 (Mo.App. 1982)."

890 S.W.2d at 710[8].

Here the record supports a finding that Father's actions crossed the line between merely placing temporary custody of T.A.P. with his parents and relegating all parental responsibilities to them. From the evidence, it is reasonable to infer that Father made intentional choices to take himself away from T.A.P. causing others to fulfill the role of guardian.

Third, there is evidence that T.A.P. has developmental problems that should be addressed by his guardian. These problems include T.A.P.'s difficulty with communication, not being toilet trained, lack of social skills, and inability to use utensils while eating. Father, however, denies that there is anything wrong with T.A.P. Paternal Grandmother, to whom Father has delegated his parental responsibilities, shares that view.

It was for the trial court to resolve this conflict in evidence. In doing so, the trial court was entitled to disbelieve Father and Paternal Grandmother on this issue. It could have concluded that they were minimizing the boy's problems to conceal their failure to deal with the problems. Alternatively, the trial court may have decided that Father was unable to recognize T.A.P.'s problems or was unwilling to deal with them. In either case, a reasonable inference could have been drawn that Father had not met T.A.P.'s developmental needs.

Giving due deference to the trial court and recognizing our limited scope of review, we find no error in the trial court's implicit finding that Father was either unwilling, unable, or unfit to perform his duties as natural guardian. Sufficient evidence exists to overcome the presumption that

T.A.P.'s best interest would be served by Father having custody. *See Williams*, 922 S.W.2d at 424. We find the that trial court did not misapply the law when it used § 475.030.4(2) to appoint someone other than Father as guardian and conservator for T.A.P. Points I and II are denied.[4]

The judgment is affirmed.

PARRISH, P.J., and MONTGOMERY, C.J., concur.

---

4. In the argument following point II of Father's brief he complains: That the trial court based its decision on his financial condition; that neglect is not a statutory consideration under § 475.030; and, that Maternal Grandmother is not morally fit to serve as T.A.P.'s guardian. These contentions are not part of Father's point relied on. Issues reflected only in the argument portion of a brief are not preserved for appellate review. *Berger v. Huser*, 498 S.W.2d 536, 539[2] (Mo. 1973).