**IN the INTERESTS OF: C.H., B.H., & T.C.**

No. ED 104772

Missouri Court of Appeals, Eastern District, DIVISION ONE.

FILED: August 15, 2017

Rachel Reagan-Purschke, Union, MO, for appellant.

Matthew C. Becker, Union, MO, for respondent.

KURT S. ODENWALD, Judge

## Introduction

Mother appeals from the trial court's judgment, which appointed Petitioners as guardians over the minor children C.H., B.H., and T.C. (collectively, the "children"). The trial court's judgment found the children's parents (Mother and three separate fathers) unwilling, unable, or unfit to fulfill their duties as guardians under Section 475.030.4(2).[1] On appeal, Mother contends that no substantial evidence supported a conclusion that she was unfit. Finding ample evidence in the record to support that conclusion, we affirm.

## Factual and Procedural History

### I. Underlying Removal of the Children

On April 30, 2012, the three minor children—at the time, T.C. was twelve-years old, B.H. six, and C.H. two—were taken into custody by the Children's Division following an investigation. The Children's Division investigation discovered drugs and paraphernalia at Mother's home, including components for manufacturing methamphetamine. The children were placed with Petitioners, the children's aunt and uncle, on a temporary basis.

This was the *third* time that the Children's Division had removed the children

---

1. All statutory references are to RSMo (2000), unless otherwise noted.

from Mother's custody. Specifically, in 2005, before C.H. was born, B.H. and T.C. were taken into custody after Mother crashed a car during "a period of time when [she was] under the influence of drugs." C.H., B.H., and T.C. were again taken into custody in 2010 after Mother was pulled over in possession of a mobile meth lab. After the two previous incidents, the children were eventually returned to Mother. The third removal happened on April 30, 2012, and the minor children have been residing with Petitioners ever since.

## II. Petitions for Letters of Co-Guardianship

In early 2013, Petitioners filed three separate petitions for letters of co-guardianship over the three children, respectively. The petitions alleged that the children's parents—Mother and the three separate fathers—were unable, unwilling, or unfit to assume their roles as guardians, and that Petitioners should be awarded co-guardianship. The trial court heard all three cases during a consolidated hearing. At the hearing, Mother, her boyfriend ("Boyfriend"), her oldest child (T.C.), Petitioners, employees of the Children's Division, and the children's counselor all testified.

## III. Trial Court's Judgment

Subsequently, the trial court rendered three separate judgments issuing letters of co-guardianship to Petitioners for the three children, respectively. The trial court found the three fathers unwilling, unable, or unfit, and none of the fathers appeal that finding.[2] In all three judgments, the trial court also found that Mother was

unable or unfit to assume the duties of guardianship and parenthood. When discussing the findings as they relate to Mother, we will treat the three judgments as one—the Mother-related findings were identical. The trial court found as follows:

The trial court first noted that Mother admitted to a previous drug addiction but claimed to be clean now. The trial court commended Mother, recognizing her "progress" on overcoming her addiction. Nevertheless, the trial court expressed concern that Mother had not fully addressed issues that could lead to further relapses.

Most notably, at the time of trial, Mother was engaged in a long-term, romantic relationship with Boyfriend. The trial court acknowledged Boyfriend's criminal history, including numerous convictions for driving while intoxicated, which sent him to prison four separate times. While Boyfriend had maintained his sobriety for some time, it was uncontroverted that he was again consuming alcohol. The trial court opined that associating with other substance abusers was a reason for Mother's previous, failed efforts at sobriety. The trial court noted that Mother had attempted to shift significant blame for her previous drug problems on a friend, who was a fellow drug user. In the trial court's view, Mother's choice of a partner suggested that she was presently unfit to assume the duties of parenthood.

The trial court continued that the evidence suggested that Boyfriend was not only drinking alcohol again, but that the frequency of his drinking had been increasing. Mother and boyfriend were cohabitating.[3] Moreover, Mother admitted that,

**2.** The fathers of C.H. and B.H. were each served and failed to appear for trial. T.C.'s father appeared, but consented to the letters of co-guardianship.

**3.** The children's caseworker testified that Mother and Boyfriend were living together.

That caseworker relayed her conversation with Mother and Boyfriend from December 2014; they both admitted that Mother kept her own residence only to satisfy the Children's Division.

during her visitation weekends with the children, she brought the children to Boyfriend's home. The trial court inferred that Boyfriend, a relapsing alcoholic, had consumed alcohol during those visits. The trial court recognized Mother's own acknowledgement that it would be detrimental for a person recovering from an addiction to associate with a relapsing addict. As such, the trial court was concerned with the state of Mother's addiction—which had previously caused the Children's Division to intervene three times—and the prospect that the children, if returned to Mother, would be exposed daily to a relapsing alcoholic. These factors were "a further indictment of [Mother's] ability and fitness to assume the duties of guardianship/parenthood."

The trial court found another factor that contributed to Mother's unfitness: the stress of being a single mother. According to the trial court, the evidence suggested that the stress of raising three children alone was partly a cause of Mother's previous, failed efforts at sobriety. This finding was premised on Mother's admission that stress was a "big part of" her drug use and T.C.'s credible testimony that, in the past, Mother had resumed drug use shortly after the children were returned.[4] When asked at trial what had changed, Mother replied that she had learned to forgive herself and did not want to "live that way" anymore. This response, together with Mother shifting blame to others,[5] gave the trial court "additional pause" before taking Mother at her word when she asserted her sobriety.

Mother's behavior during her visitation with the children also influenced the trial court's decision. Mother had been afforded periodic, unsupervised visitation after the children were removed for the third time. The trial court found Mother noncompliant with Children's Division restrictions placed on her visitations; specifically, Mother did not obtain permission before taking the children to her parents' home. The trial court found Mother's actions especially troubling because she admitted to using drugs with her mother in the past. Mother claimed that she was unaware of this restriction, but the trial court explicitly found this claim not credible: "Mother's gamesmanship [with the truth]," wrote the trial court, "is evidence that she is not yet willing to recognize and deal with her shortcomings."

The trial court noted three additional examples of Mother's poor behavior. First, despite being aware of C.H.'s peanut allergy, Mother allowed C.H. to consume foods containing peanuts. Second, despite being allowed to attend the children's extracurricular activities, Mother only attended a few. And third, the trial court found credible an anecdote about a "duck down" game. In October 2014, Mother drove the children without age-appropriate safety seats. During the trip, Mother had the children "duck down" when police were around to avoid detection. T.C. credibly testified that Mother had taught the children to play this game whenever they were being transported without age-appropriate safety seats. Again, the trial court expressly rejected Mother's version of events—that the children created the

---

4. T.C. was of the opinion that this time was no different from the previous times; Mother would resume her drug use if the children were returned.

5. In addition to shifting blame about her addiction to her former drug-using friend, Mother blamed a skin condition that C.H. had developed at *Petitioners'* home until she was confronted with the possibility that C.H.'s exposure to methamphetamine could have caused the condition.

game due to their previous negative reactions to police. The trial court further found that Mother had lied to a Children's Division caseworker about the "duck down" game. Mother's lack of candor, when confronted by the caseworker, gave the trial court "great pause" when weighing Mother's testimony.

Finally, the children's counseling sessions provided additional justification for finding Mother unfit. The trial court credited the testimony of the children's counselor. The counselor testified that she detected deficits in the parent-child relationship between Mother and the children. Specifically, the counselor believed that the children were bonded to each other, but they did not view Mother as a resource who would take care of their physical well-being. The younger children, according to the counselor, viewed T.C. and their aunt (one of the Petitioners) as fulfilling the role of mother. The younger children generally enjoyed their time with Mother, but their descriptions of those visits did not depict "anything that resembled one on one time" between the children and Mother, according to the trial court. During counseling, T.C. described her Mother as a friend, albeit an unreliable one. T.C., who was 15-years old when the judgment was issued, feared that she would be thrust back into the role of mother if the children were returned. The counselor testified that the relationship deficits between Mother and the three children would not be a "quick fix."

Taken as a whole, the trial court concluded that the evidence demonstrated Mother's "present inability to assume the duties of guardianship/parenthood." This conclusion, in addition to the evidence already outlined, was supported by Mother's suggestion that—even if she prevailed in defeating the petition for guardianship—

the children should remain in the Children's Division's custody until her relationship with them could be repaired. The trial court reasoned that Mother was presently unable to assume the duties of guardianship and parenthood given that the Children's Division already had custody of the children for three years (at the time of trial), and the reasonable inferences drawn from Mother's testimony.

After finding all natural parents of the children unwilling, unable, or unfit to assume parental duties, the trial court determined that Petitioners were well-suited to serve as guardians, and that it was in the children's best interests that Petitioners be granted full guardianship to provide a stable and permanent placement. Hence, the trial court issued letters of co-guardianship over the children to Petitioners, In addition, the trial court allowed Mother visitation with the younger children, C.H. and B.H.—two weekends per month and some holidays. Mother appeals.

## Points on Appeal

Both of Mother's points on appeal assign trial-court error to the issuance of letters of co-guardianship. Point One claims that the trial court erred because Petitioners "failed to meet the burden required by [Section] 475.030, in that [Petitioners] were required to prove that either both parents have died, the parents are unwilling, unable, or adjudged unfit to assume the duties of guardianship, or that the parents have had their parental rights terminated." Similarly, Point Two alleges that the trial court's judgment was not supported by substantial evidence, as the allowance of visitation was inconsistent with the finding that Mother was unfit.

## Standard of Review

An appellate court will affirm the judgment in a bench-tried case unless the judg-

ment incorrectly declares or applies the law, is unsupported by substantial evidence, or is against the weight of the evidence. Matter of A.L.R., 511 S.W.3d 408, 411-12 (Mo. banc 2017) (citing Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976)).

Mother's Point One does not properly request review under the Murphy v. Carron standard, as it fails to assert that the judgment incorrectly declared or applied the law, was unsupported by substantial evidence, or was against the weight of the evidence. Point One, however, does assert that Petitioners "failed to meet the burden required by [Section] 475.030." We will gratuitously construe Mother's argument as making a no-substantial-evidence claim; that is, no substantial evidence existed for Petitioners to meet their burden under Section 475.030.4(2). Because Point Two also advances a no-substantial-evidence argument, we will address Mother's points together.

In reviewing whether a judgment is supported by substantial evidence, an appellate court views all evidence in the light most favorable to the judgment. A.L.R., 511 S.W.3d at 413. We accept as true all evidence and inferences favorable to the judgment, and we disregard all contrary evidence and inferences. Id. Also, witness credibility is generally a consideration for the trial court, and it is a trial court's prerogative to disbelieve witness testimony. See Matter of T.A.P., 953 S.W.2d 638, 642 (Mo. App. S.D. 1997).

## Discussion

This discussion section first articulates the statutory framework for issuing letters of guardianship over minor children. The second subsection explains why substantial evidence supported the trial court's deci-

sion to issue letters of co-guardianship here. The final subsection rejects Mother's main arguments, which are separately addressed to avoid cluttering our analysis.

## I. Applicable Law

Three principal statutes govern the appointment of a minor's guardian. In re L.M., 488 S.W.3d 210, 214 (Mo. App. E.D. 2016). First, Section 475.025 provides that a child's father and mother, while living, are the natural guardians, with custody over and care of the child's person and education. Second, Section 475.030.4 allows the probate court to issue letters of guardianship over minors: "(1) Where a minor has no parent living; (2) Where the parents or the sole surviving parent of a minor are **unwilling, unable or adjudged unfit to assume the duties of guardianship;** (3) Where [all surviving parents] have had their parental rights terminated [in juvenile court]." (Emphasis added.) The petitioners bear the burden to prove either of the conditions in Section 475.030.4 by a preponderance of the evidence. A.L.R., 511 S.W.3d at 410, Third, if letters of guardianship can be issued, Section 475.045 (Cum. Supp. 2012) answers the question "to whom?" as this section establishes an order of preference to potential guardians. The following persons (so long as they are willing and otherwise qualified) shall be appointed as guardians under Section 475.045.1:

(1) The parent or parents of the minor, except as provided in section 475.030;

(2) If any minor over the age of fourteen years has no qualified parent living, a person nominated by the minor, unless the court finds appointment contrary to the best interests of the minor; .... [6]

6. A third preference is inapplicable here—it prefers potential guardians appointed in the

last surviving parent's will. All parents in this case are living.

If no appointment is made under Subsection 1, Subsection 3 directs the trial court to appoint as guardian "the most suitable person who is willing to serve and whose appointment serves the best interests of the child to a stable and permanent placement." Section 475.045.3.

Section 475.045.1(1) may appear unnecessary at first glance, because there is no need for a parent to be appointed guardian when such a parent, by virtue of Section 475.025, is already the guardian. Reece v. Reece, 890 S.W.2d 706, 709-10 (Mo. App. W.D. 1995). But appellate courts have read these three statutes *in pari materia* as prohibiting letters of guardianship for a minor from issuing unless there is no parent available, willing, and able to fulfill the parental role as a natural guardian. Id. As such, a rebuttable presumption exists that a parent is the appropriate guardian for his or her child. Cotton v. Wise, 977 S.W.2d 263, 264 (Mo. banc 1998). That presumption is overcome when the requirements for issuing letters of guardianship, under Section 475.030.4, are met. Id.

## II. The Trial Court Properly Issued Letters of Co-Guardianship to Petitioners

Here, all parents of the three children are living and, thus, are presumptively the natural guardians of their children. See Section 475.025. The trial court, under Section 475.030, found that all parents (Mother and the three fathers) were unwilling, unable, or unfit to assume the duties of guardianship and parenthood. The fathers do not appeal that ruling, and so we do not address these findings as they relate to the fathers. However, Mother claims that no substantial evidence supported a finding that she was unable or unfit. Therefore, the issue before us is whether substantial evidence supports the trial court's conclusion that Mother was unable or unfit to assume the duties of guardianship, thereby overcoming the presumption that Mother, as a natural parent, is the appropriate guardian for C.H., B.H., and T.C. See Sections 475.025 and 475.030.4(2); Cotton, 977 S.W.2d at 264.

Our courts have outlined the parameters of the words "unwilling," "unable," and "unfit" as used in Section 475.030.4(2). "Unwilling" and "unable" are essentially species of child abandonment; whereas, "unfit" imports parental neglect. T.A.P., 953 S.W.2d at 642. The trial court was primarily concerned with Mother's parental neglect in determining her unfit to serve as the children's guardian. In the general sense, "neglect" focuses on physical harm or deprivation, but in this sense also involves "a failure to perform parental duties imposed by law and by conscience." Id. Evidence of neglecting a child can demonstrate a parent's unfitness, so long as the neglect relates to the "parent's duties as natural guardian." Id. (quoting Reece, 890 S.W.2d at 711 n.12). "Unfit" has a broad definition in child-custody cases, and trial courts have broad discretion in applying the term. Id.

Courts have considered many factors in determining a parent's fitness. See L.M., 488 S.W.3d at 217. Some factors include the stability in a parent's life, the care the parent could provide on a daily basis, the environment in which the child would be raised, the amount of effort made by the parent to furnish any financial support, and the parent's mental health. Id. (citing In Matter of J.D.D., 450 S.W.3d 836, 842 (Mo. App. E.D. 2014)). "[W]hether a parent is unfit must be based on existing conditions, but past conditions may illuminate the understanding of present conditions." L.M., 488 S.W.3d at 217 (citing In re Estate of L.G.T., 442 S.W.3d 96, 112 (Mo. App. S.D. 2014)).

■ Viewing the facts most favorably to the judgment and deferring to the trial court's credibility determinations, we hold that substantial evidence supported the trial court's conclusion that Mother was unfit to assume the duties of guardianship.

As an initial matter, the trial court did not believe that Mother had fully addressed her drug addiction. To compound Mother's addiction-related issues, she engaged in a long-term relationship with an alcoholic—one who had relapsed according to Mother's own testimony. Mother knowingly brought the children to Boyfriend's home during his relapse. Mother blamed her past drug problems on a friend who influenced her to use drugs. Mother's past association with substance abusers, the trial court reasonably inferred, was a reason for her prior drug problems, and now she was repeating that pattern of behavior. Mother acknowledged that it was not a good idea for a recovering addict to associate with a relapsing addict. The stress of being a single mother also partially contributed to Mother's past drug problems. The trial court was not persuaded that anything had changed in Mother's life with regard to this catalyst, as she would still be a single mother if the children were returned. Mother was still coping with an addiction that had thus far resulted in the removal of her children three times. In short, there was reason to question the stability in Mother's life.

Beyond Mother's addiction, the trial court admonished Mother's behavior when she was with the children. Mother brought her children to spend the night at her parents' house without permission, which violated Children's Division restrictions. This fact was particularly troubling to the trial court given Mother's prior drug use with her parents. Mother also suggested the "duck down" game to hide the children from police detection because Mother was not using age-appropriate car seats. Such evidence indicated the lack of care that Mother would provide to the children and the poor environment in which those children would be placed.

Finally, the counselor's credible testimony provided additional evidence of Mother's unfitness. The children did not perceive Mother as a resource who would take care of them. In fact, C.H. and B.H. viewed the older child, T.C., as more of a mother figure. T.C., in turn, worried that she would be thrust into the role of mother—again—if Mother regained custody. The counselor opined that Mother's relationship with the children would not be a quick fix.

Mother's past and present drug-related issues, her behavior while with the children, the opinions of the children, and the other facts found by the trial court amply support a conclusion that Mother is presently unfit to assume the duties of guardianship. See Section 475.030.4(2). Our holding is bolstered by our deference to the trial court's broad discretion in applying the term "unfit." T.A.P., 953 S.W.2d at 642. As such, letters of guardianship may issue. See Section 475.030.4(2).

The only remaining question, then, is who may be appointed guardian? See Section 475.045. The trial court found that Petitioners were best suited to serve as the guardians over all three children, and that such an appointment was in the children's best interests. Mother does not appeal this ruling or argue that Petitioners were unqualified to serve as guardians. T.C., who was fifteen-years old when the judgment issued, wanted Petitioners to be appointed, so the trial court properly awarded Petitioners guardianship over T.C. because the trial court did not find the appointment to be against T.C.'s best interest. See Section 475.045.1(2) (subject to a few exceptions not relevant here, a

trial court must appoint a guardian nominated by a minor who is over the age of fourteen years, unless the court finds this appointment to be against the minor's best interest). Regarding C.H. and B.H., both years younger, the trial court made the appropriate finding that Petitioners were the most suitable people and that the appointment served the best interests of those children. See Section 475.045.3.

Because the trial court made appropriate findings, supported by substantial evidence, when issuing the letters of co-guardianship, no error occurred.

## III. Rejection of Mother's Arguments

We will briefly address Mother's arguments on appeal. Point One is deficient in two major respects.

First, Mother attempts to isolate the trial court's findings as if each finding is the *only* reason for her unfitness. For example, Mother acknowledges the challenges of her relationship with Boyfriend, but maintains that the trial court should not have determined her fitness as a parent solely by those with whom she associates. Mother further argues that the trial court should not have considered the "duck down" game anecdote in concluding that she was unfit. "This singular fact," Mother insists, "does not rise to the level of unfit or unable." Mother further challenges the trial court's mention of Mother's inability to attend all of her children's extracurricular activities. Mother contends, "It is unreasonable, and outside the parameters set forth in Missouri law, for this court to determine a parent is unfit or unable to serve as a guardian because the parent cannot attend 100% of the all three [*sic*] (3) of the children's extra-curricular activities." Mother's attempt to segregate certain trial-court findings and to portray

them as the lone basis for the trial court's judgment is simply inaccurate. The record before us shows that trial court properly viewed the evidence in its entirety.

Second, Mother ignores our standard of review, which requires us to view facts in the light most favorable to the judgment, A.L.R., 511 S.W.3d at 413, and to defer to the trial court on credibility determinations, T.A.P., 953 S.W.2d at 642. Mother acknowledges Boyfriend's relapsing troubles, but asserts that this was the reason she maintained a separate residence. But the trial court expressly and repeatedly found Mother *not* credible. The evidence suggested that Mother brought the children to Boyfriend's home during visitations and that Mother essentially cohabitated with Boyfriend, so it was entirely reasonable to infer that the children would be frequently exposed to Boyfriend in the future. Further, Mother's contention that she has maintained her sobriety for multiple years would have us believe her over the trial court's disbelief that she had fully resolved her drug-related issues. Our standard of review prevents us from doing so. Our standard of review requires us to conclude that Mother failed to address all her drug-related issues, which would risk yet another relapse that would endanger the children once again. Finally, Mother asserts that there "was no evidence of instability [in] the home, apart from the allegations regarding [Mother's] relationship with [Boyfriend.]" Mother overlooks the evidence that the children had been removed from her custody *three* times [7] because of *her* drug-related problems. The younger children considered T.C., not Mother, to be the mother figure, and Mother was not reliable. Mother did not put the children in age-appropriate safety seats. Mother fed C.H. foods containing peanuts even after she was in-

---

7. C.H. was removed only twice, as she was not yet born the first time.

formed of C.H.'s peanut allergy by her own children. Violating restrictions on her visitation, Mother brought the children to see her parents, who used drugs with Mother in the past. Mother may disagree with the trial court's findings, but the findings are supported by evidence and our standard of review requires us to accept them. Point One has not demonstrated trial-court error.

Point Two cites the Latin maxim *expressio unius est exclusio alterius*— "The expression of one thing is the exclusion of another"[8]—and notes that both Petitioners agreed to allow Mother visitation rights and the trial court's judgment allowed Mother visitation rights with C.H. and B.H. The trial court cannot have it both ways, so Mother's argument goes, "Either [Mother] is unfit or unable to serve as guardian, or she is suited to reunify with her children. The two cannot both be true." Except they can. For our Supreme Court has stated, albeit in dicta:

> Though [the father] may be judged to be unfit, unable or unwilling to care for his children, nothing in the guardianship statute would preclude the court from allowing visitation by the father, thus maintaining the child-parent relationship that [the father] has with the children, for so long as the trial court finds that such provisions are in the children's best interests.

Cotton, 977 S.W.2d at 265 n.2. Mother has not provided any authority for her argument, nor suggested why Cotton should not provide guidance for our holding. In fact, the trial court, expressing compassion, clearly indicated a desire that Mother maintain a relationship with her children. We too hope that Mother will continue to work on her drug-related issues and to rebuild her relationship with the children. The issue before us is not a termination of parental rights, but the appointment of a guardian. Mother has the opportunity to petition the trial court to terminate the guardianship should she be able to demonstrate her fitness to resume the role of guardian. See Section 475.083.2(3) (Cum. Supp. 2012) (allowing the trial court to terminate a guardianship if "the court finds that a parent is fit, suitable and able to assume the duties of guardianship and it is in the best interest of the minor that the guardianship be terminated"). Point Two has not demonstrated trial-court error. Accordingly, Points One and Two are denied.

### Conclusion

The judgment of the trial court is affirmed.

Robert G. Dowd, Jr., P.J., concurs.

Sherri B. Sullivan, J., concurs.

8. Black's Law Dictionary 1830 (9th ed. 2009).