IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
IN RE: E.R.V.A., MINOR; )
R.W. & K.W., )
 )
 Respondents, )
 )
v. ) WD84222
 )
H.P.A. & A.M.A., ) Opinion filed: March 30, 2021
 )
 Appellants. )

 APPEAL FROM THE CIRCUIT COURT OF DEKALB COUNTY, MISSOURI
 THE HONORABLE J. BARTLEY SPEAR, JR., JUDGE

 Division Two: W. Douglas Thomson, Presiding Judge,
 Lisa White Hardwick, Judge and Edward R. Ardini, Jr., Judge

 A.M.A. (“Mother”) and H.P.A. (“Father”) appeal from the judgment entered by the Circuit

Court of Dekalb County finding Mother and Father unwilling, unable and unfit to assume their

parental duties and ordering that letters of guardianship issue for their minor child E.R.V.A. We

affirm.

 Factual and Procedural Background

 On January 3, 2017, E.R.V.A.’s paternal aunt and uncle (“Petitioners”) filed a petition

seeking a guardianship and conservatorship of E.R.V.A.1 Father, who was in prison, executed a

1
 Petitioners also sought a guardianship and conservatorship for E.R.V.A.’s younger sister, G.I.L.A., in a separate
action.
waiver of notice or summons and consent to entry of guardianship and conservatorship. Mother,

whose whereabouts were unknown, was served by publication. On June 8, 2017, the probate court

conducted a hearing on the petition and, on June 13, 2017, judgment was entered appointing

Petitioners as co-guardians and co-conservators for E.R.V.A.

 Nearly a year later, Mother and Father (collectively, “Parents”) filed a motion to set aside

the judgment, arguing the probate court lacked personal jurisdiction over Mother due to

insufficiencies in the affidavit submitted in support of the request for service by publication. The

probate court granted the motion.2 Parents thereafter filed a motion to dismiss, arguing that the

guardianship statute was unconstitutional. The motion to dismiss was denied by docket entry and

the probate court proceeded to conduct a trial, held over four days, during which the following

evidence was presented:

 E.R.V.A. was born on May 21, 2015, and lived with Parents in a home in Gallatin,

Missouri, that had been purchased by Father’s parents. In 2016, the home fell into a state of

disrepair and was described as “marginally habitable.” Parents frequently requested Petitioners

and Father’s parents to babysit E.R.V.A. so that they could have “date nights;” however, in many

instances, Parents would remain absent for multiple days without communication. On those

occasions, Parents would not provide sufficient diapers, clothing, or food for E.R.V.A.

 In September of 2016, a search warrant was executed at Parents’ home that resulted in

Father being charged with and later convicted of possession of a controlled substance. 3 Father

served one year in prison before being released on parole.

2
 Father also withdrew his consent to the guardianship and conservatorship.
3
 G.I.L.A. was born during the period between the execution of the search warrant and Father’s arrest.

 2
 Around the period of Father’s incarceration, Mother left E.R.V.A. and her sister in the care

of Father’s parents, and Mother formally delegated some of her parental rights by way of a power

of attorney dated November 14, 2016, to her father-in-law, who, along with his wife, shared a

duplex style residence with Petitioners. At some point, Petitioners assumed the responsibility of

caring for E.R.V.A. and her sister.

 Parents displayed poor parenting skills when E.R.V.A. was in their custody. E.R.V.A.

received no prenatal care, was described as “small and thin” and, at the time of trial, continued to

display characteristics consistent with severe malnourishment. She had not been properly

vaccinated, had suffered from a severe diaper rash that had remained untreated for days, and her

playpen at the Gallatin residence was urine soaked. In addition, E.R.V.A. was found to be

developmentally delayed. Moreover, although Mother would be the primary caregiver while

Father was at work should E.R.V.A. be returned to Parents’ custody, Mother had expressed to

Petitioners and her in-laws that she did not want E.R.V.A. or her younger sister “permanently” or

“anymore.”

 Parents’ relationship became strained during Father’s incarceration, however, the two

reunited upon his release and moved to the Lake of the Ozarks. Parents started a successful

construction/home improvement business and purchased multiple properties in that area, including

a primary residence. Parents set up a bedroom and play room in the home for E.R.V.A. and her

sister, but not all of the toys and clothing were age appropriate.

 Father admitted to a substantial criminal history involving drugs, thefts, and assaultive

behavior.4 Father suffers from an addiction to controlled substances, including methamphetamine,

dating back to his teenage years. After the birth of E.R.V.A.’s sister, Father consumed pain

4
 At the time of trial, Father had a pending stealing charge in Camden County.

 3
medication that had been prescribed to Mother. In addition, Father suffers from mental health

issues and has been diagnosed with ADHD for which he has been prescribed medication. Other

than a four-hour educational drug course, he had not received any counseling or treatment for

substance abuse since his release from incarceration.

 Mother has similarly abused controlled substances but has not received counseling or

treatment for this problem. She used methamphetamine during Father’s incarceration, left illegal

drugs in the children’s diaper bag and enabled Father’s addiction by providing him with pills

prescribed to her. On January 6, 2020, while this guardianship action was pending, Mother entered

an Alford5 plea to felony possession of a controlled substance and received probation. Mother

claimed that she did not remember the events that led to her arrest, but eventually acknowledged

that drugs and paraphernalia were found in her vagina by law enforcement after she, Father, and

another man had been stopped for a traffic violation. In addition, Mother does not have a driver’s

license but continues to unlawfully operate automobiles. Mother has struggled with depression and

received inpatient psychiatric care after attempting suicide and remained under the treatment of a

psychiatrist at the time of the trial.

 During the pendency of this guardianship action, Parents attended therapeutic visits with

E.R.V.A. and her sister. Parents occasionally brought gifts, but had only provided $127.00 in

monetary support to Petitioners to assist in their care of E.R.V.A. and her sister.

 The probate court granted letters of guardianship6 to Petitioners:

 [B]y a preponderance of the evidence, the court has determined Petitioners
 overcame the presumption that Parents should serve as natural guardians by
 showing: Mother is unwilling (no support; does not want to be a primary caregiver),
 unable (poor parenting skills; substance abuse; mental health), and unfit (substance
 abuse; disregard for the law; poor parenting skills); Father is unwilling (no support),

5
 North Carolina v. Alford, 400 U.S. 25 (1970).
6
 The probate court denied Petitioners’ request for conservatorship, finding that E.R.V.A. did not have an estate.

 4
 unable (poor parenting skills; substance abuse; intention to make Mother caregiver
 in his absence), and unfit (substance abuse; disregard for the law; poor parenting
 skills).

Parents appeal.

 Discussion

 Parents raise two points on appeal, challenging the constitutionality of section 475.030,

RSMo,7 and arguing the probate court applied the wrong standard of proof. In Point I, Parents

argue that section 475.030.4(2), RSMo, violates principles of due process guaranteed by the federal

and state constitutions in that “it allows a court to indefinitely sever the parent-child relationship

without necessary safeguards.” In Point II, Parents claim that the probate court erred by failing to

hold Petitioners to a “clear and convincing standard of proof,” asserting that a “minor guardianship

affects the fundamental liberties protected by the federal and state constitutions and such

interference must be supported by a higher standard of proof.”

 Jurisdiction

 Generally, the Missouri Supreme Court has exclusive jurisdiction over a challenge to the

constitutionality of a statute. Mo. Const. art. V, § 3; Lewis v. Dep’t of Soc. Servs, 61 S.W.3d 248,

253 (Mo. App. W.D. 2001). However, the Supreme Court’s “exclusive appellate jurisdiction is not

invoked simply because a case involves a constitutional issue.” McNeal v. McNeal-Sydnor, 472

S.W.3d 194, 195 (Mo. banc 2015). Instead, such exclusive jurisdiction is only invoked when “a

party asserts that a state statute directly violates the constitution either facially or as applied[;]”

and when the “constitutional issue [is] real and substantial, not merely colorable.” Id. (citing

Alumax Foils, Inc. v. City of St. Louis, 939 S.W.2d 907, 912 (Mo. banc 1997); Mayes v. St. Luke’s

Hosp. of Kansas City, 430 S.W.3d 260, 270 (Mo. banc 2014)).

7
 Statutory references are to the Missouri Revised Statutes (2016).

 5
 “‘In determining whether a constitutional claim is real and substantial or merely colorable,

[the reviewing c]ourt makes a preliminary inquiry as to whether [the claim] presents a contested

matter of right that involves fair doubt and reasonable room for disagreement.’” Matter of Brown

v. State, 519 S.W.3d 848, 853 (Mo. App. W.D. 2017) (quoting Mo. Hwy and Transp. Comm’n v.

Merritt, 204 S.W.3d 278, 285 (Mo. App. E.D. 2006) (alterations in Brown)). “‘If this initial inquiry

shows that the claim is so legally or factually insubstantial as to be plainly without merit, the claim

may be deemed merely colorable.’” Id. (quoting Merritt, 204 S.W.3d at 285). In addition, “[a]

claim challenging the validity of a statute is ‘merely colorable’ if it has already ‘been addressed

by either the United States Supreme Court or the Missouri Supreme Court[.]’” Derby v. State, 557

S.W.3d 355, 363 (Mo. App. W.D. 2018) (quoting Matter of J.D.B., 541 S.W.3d 662, 666 (Mo.

App. E.D. 2017)). Parents’ claims are merely colorable; therefore, this Court has jurisdiction.8

 Standard of Review

 “The circuit court’s interpretation of the [c]onstitution is reviewed de novo.” Mo.

Veterinary Med. Bd. v. Gray, 397 S.W.3d 479, 481 (Mo. App. W.D. 2013) (citing City of Arnold

v. Tourkakis, 249 S.W.3d 202, 204 (Mo. banc 2008)). “The constitutional validity and construction

of state statutes are also reviewed de novo.” Id. (citing Sch. Dist. of Kansas City v. State, 317

S.W.3d 599, 604 (Mo. banc 2010)). “A statute is presumed valid and will be found unconstitutional

only if it clearly contravenes a constitutional provision.” Id. (citing In re Brasch, 332 S.W.3d 115,

119 (Mo. banc 2011)).

 Point I

 In their first point, Parents claim that section 475.030.4(2), RSMo, violates due process

protections guaranteed by the United States and Missouri Constitutions arguing that “the probate

8
 This appeal was originally filed with the Missouri Supreme Court before being ordered transferred on the Supreme
Court’s own motion to this Court, “where jurisdiction is vested.”

 6
code fails to adequately provide for the protection of the fundamental relationship between parent

and child[.]”

 “The Fourteenth Amendment to the United States Constitution and Article I, § 10 of the

Missouri Constitution provide no state shall deprive any person of life, liberty or property without

due process of law.” Matter of Estate of Potashnick, 841 S.W.2d 714, 719 (Mo. App. E.D. 1992).

Procedural due process “requires notice and an opportunity to be heard.” Id. (citing Milliken v.

Meyer, 311 U.S. 457, 463 (1940)). In addition to procedural due process, “[t]he United States

Supreme Court has long recognized that the Fourteenth Amendment’s Due Process Clause[ ] . . .

includes a substantive component, providing greater protection against government interference

with certain fundamental rights and liberty interests.” T.W. ex rel. R.W. v. T.H., 393 S.W.3d 144,

147-48 (Mo. App. E.D. 2013) (citing Troxel v. Granville, 530 U.S. 57, 65 (2000)).

 “The liberty interest at issue in this case—the interest of a parent in the care, custody, and

control of [their] child—is perhaps the oldest of the fundamental liberty interests recognized by

the United States Supreme Court.” Id. (citing Troxel, 530 U.S. at 65). “Of course, this

Constitutional right is not absolute[; t]he cases demonstrate many circumstances in which state

regulation is proper and not unconstitutional because it is an area that has traditionally been

reserved to the states.” Herndon v. Tuhey, 857 S.W.2d 203, 207 (Mo. banc 1993) (citing Ginsberg

v. New York, 390 U.S. 629, 639 (1968) (“[t]he well-being of its children is a subject within the

State's constitutional power to regulate”)). As recognized by the United States Supreme Court, a

state “has a wide range of power for limiting parental freedom” and “may restrict the parent's

control by requiring school attendance, regulating or prohibiting the child’s labor and in many

other ways.” Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944) (citations omitted). As

explained by our Supreme Court in the context of an action to terminate parental rights—the most

 7
severe intrusion into the parent-child relationship— “‘due process requires that a party be given

‘notice reasonably calculated, under all the circumstances, to apprise interested parties of the

pendency of the action and afford them an opportunity to present their objections.’” In re H.L.L.,

179 S.W.3d 894, 897 (Mo. banc 2005) (quoting In Interest of Loveheart, 762 S.W.2d 32, 34 (Mo.

banc 1988)).

 With these constitutional principles in mind, we examine the statutory framework

governing guardianship proceedings involving minors. There are three primary provisions that

guide our analysis: sections 475.025, 475.030.4, and 475.045, RSMo. In Interests of C.H., 525

S.W.3d 205, 210 (Mo. App. E.D. 2017) (citing In re L.M., 488 S.W.3d 210, 214 (Mo. App. E.D.

2016)). Section 475.025, RSMo, establishes that a mother and father are the natural guardians of

their children and have control over “the custody and care of their persons and education.” Section

475.030.4, RSMo, authorizes the court to issue “[l]etters of guardianship of the person of a minor”

when “the parents . . . are unwilling, unable or adjudged unfit to assume the duties of

guardianship[.]” § 475.030.4(2), RSMo. Letters of guardianship may issue only upon petitioners’

showing of the existence of the conditions set forth in section 475.030.4, RSMo, by a

preponderance of the evidence. In Interests of C.H., 525 S.W.3d at 210 (citing Matter of A.L.R.,

511 S.W.3d 408, 410 (Mo. banc 2017)). Finally, if it is established that the parents are “unwilling,

unable or adjudged unfit to assume the duties of guardianship” under section 475.030.4(2), RSMo,

the probate court is directed to appoint “the most suitable person who is willing to serve and whose

appointment serves the best interest of the child to a stable and permanent placement.” § 475.045.3,

RSMo.

 Our appellate courts have read these statutory provisions in pari materia, finding that they

“prohibit[ ] letters of guardianship for a minor from issuing unless there is no parent available,

 8
willing, and able to fulfill the parental role as a natural guardian.” In Interests of C.H., 525 S.W.3d

at 211 (citing Reece v. Reece, 890 S.W.2d 706, 709-10 (Mo. App. W.D. 1995)). Thus, “a rebuttable

presumption exists that a parent is the appropriate guardian for his or her child.” Id. (citing Cotton

v. Wise, 977 S.W.2d 263, 264 (Mo. banc 1998)). “That presumption is overcome when the

requirements for issuing letters of guardianship, under Section 475.030.4, are met.” Id. (citing

Cotton, 977 S.W.2d at 264).

 Parents assert that section 475.030, RSMo, is unconstitutional, arguing that the statute “is

fundamentally unfair to natural parents” in that it “fails to provide any resources to a natural parent

to overcome or ameliorate the conditions which led to the initial appointment of guardianship[;]”

it “fails to require any annual review of the status of the minor child or the ability of a natural

parent to resume their role as natural guardian[s;]” and it “shifts the burden of terminating the

minor guardianship onto the natural parent, while adding the requirement that they show such

termination is in the best interests of the minor child.”

 Fundamental Fairness

 Parents argument that section 475.030.4, RSMo, is fundamentally unfair to natural parents

is without merit.

 Missouri’s statutory scheme properly and adequately embraces the deference that natural

parents must be constitutionally afforded in the guardianship context. A third-party may petition

the probate court to issue letters of guardianship under section 475.030.4(2), RSMo, only upon

allegation that the natural parents are “unwilling, unable or adjudged unfit” to serve as the minor’s

guardian. Unless they have signed the petition or waived notice, the parents of the minor must be

provided notice of the petition prior to a guardian being appointed. § 475.070, RSMo. The third-

party bears the burden of establishing that the parents lack the willingness, ability or fitness to

 9
serve as the minor’s guardian; a burden that is appropriately heightened by a legal presumption

that a natural parent is the child’s appropriate guardian. See In Interests of C.H., 525 S.W.3d at

211. Finally, it is only after a petitioner has rebutted that presumption and carried their burden that

the probate court may issue letters of guardianship to a petitioner. See id. This statutory framework

is in accord with due process requirements.

 Parents do not engage in a specific examination of the aforementioned statutory process

and the protections afforded therein and instead attempt to contrive a due process argument by

comparing section 475.030.4(2), RSMo, to the procedures prescribed in chapter 211, Missouri’s

juvenile code, applicable to allegations of abuse and neglect asserted by the State against a parent.

Parents argue that section 475.030, RSMo, is constitutionally infirm because it does not offer the

same protections and services found in chapter 211. In this effort, Parents disregard the different

purposes served by chapter 475 and chapter 211.

 Unlike a petition for guardianship sought under section 475.030, RSMo, proceedings

involving abuse and neglect initiated under chapter 211, RSMo, are brought by the State and may

result in the termination of parental rights. See § 211.444; § 211.447, RSMo. “The termination of

parental rights has been characterized as tantamount to a ‘civil death penalty.’” In re K.A.W., 133

S.W.3d 1, 12 (Mo. banc 2004) (citations omitted). Therefore, “[t]hose faced with forced

dissolution of their parental rights have a more critical need for protections than do those resisting

state intervention into ongoing family affairs.” Id. (citations omitted). A guardianship under

chapter 475, RSMo, on the other hand, is not a permanent severance of the relationship between a

parent and a child. Instead, “the granting of letters of a minor is done as a stop-gap measure to

provide care and custody of a minor for the period of time when the natural guardian-parent is

unable, unwilling, or unfit to perform this parental function.” Flathers v. Flathers, 948 S.W.2d

 10
463, 468 (Mo. App. W.D. 1997) (citing §§ 475.025, 475.030, 475.045; Reece, 890 S.W.2d at 710).

“Logically, when the parent is once again able to perform his or her duties as the natural guardian,

the need for the guardianship ceases to exist and is subject to being terminated.” 9 Id. As the

foregoing confirms, a guardianship proceeding is meaningfully different from chapter 211 actions.

 Annual Review

 Parents next complain that the provisions applicable to guardianships for minors are

constitutionally deficient because they do not mandate an annual review by the probate court. In

support of this argument, they exclusively rely on section 475.082.1, RSMo, which requires that

the probate court must “[a]t least annually” inquire into the status of every adult ward or protectee

under its jurisdiction and then note the lack of a similar mandate imposed on the probate court

when the ward is a minor.10 In making this argument, Parents make no mention of section 475.083,

RSMo; a significant oversight. Under section 475.083.2(3), RSMo, a guardianship may be

terminated “[i]f the court finds that a parent is fit, suitable and able to assume the duties of

guardianship and it is in the best interest of the minor that the guardianship be terminated[.]”

Importantly, a petition seeking termination of a guardianship may be filed every 180 days.

9
 Parents argue that even temporary orders implicate greater constitutional protections, pointing us to In Interest of
A.L.W., 773 S.W.2d 129, 134 (Mo. App. W.D. 1989) (citations omitted) (“The order of disposition under § 211.183,
although a temporary order and so subject to modification, nevertheless implicates the fundamental right of natural
parents to rear their own children free of undue government interference[, which is] an interest due process protects
by a clear and convincing evidence standard of proof, as well as by other procedures.”). This argument does not assist
parents because, as this Court proceeded to state, “[t]hose requirements rest on the palpable reality that the adjudication
of parental neglect which empowers the juvenile court to assume jurisdiction over the child to the temporary exclusion
of the parent constitutes prima facie evidence of permanent neglect, and so augurs a termination of the parental right
altogether.” Id. By contrast, chapter 475 does not include an inherent risk of termination of parental rights.

10
 It is important to note that while the probate court is not statutorily mandated to conduct an annual review of a
minor’s guardianship, such reviews are not prohibited. In fact, the probate court in this instance did perform an annual
review of the guardianships of E.V.R.A. and her sister.

 11
§ 475.083.6, RSMo. Therefore, a parent who believes that he or she is fit to resume parental duties

can petition the probate court up to twice per year in an effort to terminate the guardianship.11

 Point I denied.

 Point II

 In their second point, Parents assert that the probate court’s use of the preponderance of

the evidence standard was improper arguing that “a clear and convincing standard” is required in

a guardianship involving a minor due to the constitutional concerns raised in Point I. Parents claim

that the clear and convincing standard is appropriate due to the importance of the parent/child

relationship, again directing us to abuse and neglect and termination of parental rights cases. See

In re Monnig, 638 S.W.2d 782, 785-86 (Mo. App. W.D. 1982); section 211.447.6, RSMo.

However, the proper burden of proof in a guardianship case involving a minor was recently

addressed by our Supreme Court in Matter of A.L.R., 511 S.W.3d 408, 412 (Mo. banc 2017). In

A.L.R., the Court confirmed that “[b]y remaining silent in section 475.030 as to what burden of

proof applies, the legislature signaled that a preponderance of the evidence standard applies.” Id.

at 413.

 Point II denied.

11
 Whether procedures for terminating a guardianship are constitutionally sufficient is not before us and can only be
raised in an appeal from the denial of a petition for the termination of a guardianship. Matter of A.L.R., 511 S.W.3d
408, 413 (Mo. banc 2017) (“Any argument as to the impropriety of the burden of proof applicable to a petition to end
the guardianship . . . is premature”).

 12
 Conclusion

 The judgment of the probate court is affirmed.

 __________________________________________
 EDWARD R. ARDINI, JR., JUDGE

All concur.

 13